UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PHILIP ELLIS FOSTER,

                         Plaintiff,

            -against-

UNITED STATES OF AMERICA,

                         Defendant.

Case No. 1:22-cv-04496 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

At the center of this litigation is Maxim Lubovsky's *Lights Across the Lake* (the "Painting"), a twentieth-century oil painting commissioned in 1938 under a New Deal–era federal work-relief program, the Works Progress Administration's ("WPA") Federal Arts Project ("FAP"). Plaintiff Philip Ellis Foster ("Plaintiff" or "Foster"), a former New York City attorney and teacher with a doctorate in Art History, routinely purchases and resells artworks through online auctions. Foster, inspired by *Lights Across the Lake*'s resemblance to Central Park West, purchased the Painting from Jackson's International Auctioneers ("Jackson's") in Iowa in 2013. In 2021, Foster sought to resell the Painting through Swann's Auction House in New York City. But the General Services Administration Office of the Inspector General ("GSA-OIG") intervened, asserting that *Lights Across the Lake* was government property, and retrieved it from Swann's Auction House. Foster brought this suit against the United States (the "Government") in response.

Foster, understandably seeking to reap the benefits of his investment, asserts that he is the rightful owner of *Lights Across the Lake*. The Government in turn maintains that, as the steward of WPA artwork created for the public use and enjoyment, it has never divested its ownership interest in *Light Across the Lake*. Foster initially asserted many legal claims

against several defendants in this case, but the scope of the legal issues and the parties involved has since substantially narrowed.  Foster now brings this case solely against the United States, and the Court is asked to resolve a single question: Is the Government or Foster the rightful owner of the Painting?

## BACKGROUND[1]

On May 31, 2022, Foster, initially appearing *pro se*, filed a Complaint against the General Services Administration ("GSA"); Robin Carnahan, in her official capacity as Administrator of the GSA; the GSA-OIG; Carol Fortine Ochoa, in her official capacity as Inspector General of the GSA; and the United States.  Dkt. 1 ("Compl.").  Foster, now represented by counsel, filed an Amended Complaint on December 27, 2022, against the aforementioned defendants, asserting five claims: (1) a Fifth Amendment claim for taking the Painting without just compensation; (2) a procedural due process claim under the Fifth Amendment for depriving Foster of his property interest in the Painting through constitutionally insufficient procedures; (3) a claim that seizure of the Painting was arbitrary and capricious in violation of the Administrative Procedure Act ("APA") of 1946, 5 U.S.C. § 551 *et seq.*; (4) a state law conversion claim; and (5) a state law abuse of process claim related to the seizure of the Painting.  Dkt. 21 ("Am. Compl.").

After discovery, the Government moved for summary judgment on December 20, 2023.  Dkt. 46.  After oral argument, the Court denied summary judgment in a bench ruling on August 14, 2024.  Dkt. 67; Dkt. 73.

In the parties' joint pretrial order, filed on January 21, 2025, the Court was informed that Foster had agreed to withdraw all claims against the federal-agency defendants and the

---

[1] Citations to "PX" refer to a plaintiff exhibit; "DX" to a defense exhibit; "JX" to a joint exhibit; and "Tr." to the trial transcript.

federal-official defendants and to proceed against only the United States.  Dkt. 95 at 3.  Foster also agreed to withdraw his APA and abuse of process claims.  *Id.*  Finally, the parties stipulated to limit the relief sought to equitable relief — the return of the Painting — and no monetary damages.  *Id.* at 6, 39.  In sum, the parties stipulated that:

> if the Court determines that Plaintiff holds title to the Painting, and if that determination is affirmed following the completion of all available appeals, Defendants will return the Painting to Plaintiff in full satisfaction of Plaintiff's claims in this action.  Accordingly, the parties agree that the sole issue to be determined at trial is whether Plaintiff or Defendants hold title to the Painting.  The Court need not address damages or the adequacy of the processes and procedures followed by Defendants in obtaining custody of the Painting in 2021.

*Id.* at 12.  This was confirmed during the final pretrial conference on February 12, 2025, at which time Foster also withdrew his conversion claim.  Dkt. 109; Dkt. 110 at 19:8-20:11.  On March 7, 2025, the parties thereafter filed a formal joint stipulation, entered by the Court, dismissing with prejudice Foster's APA, conversion, and abuse of process claims, as well as claims against all defendants other than the United States.  Dkts. 120, 121.

On January 21, 2025, the parties submitted their pretrial proposed findings of fact and conclusions of law.  Dkts. 92, 94.  On February 18 and February 19, 2025, the Court held a bench trial.  As part of the discovery process, the parties engaged in extensive historical research and document collection from the National Archives and elsewhere, and numerous documentary exhibits were introduced at trial.  In addition to receiving into evidence the documentary evidence, the Court personally examined *Lights Across the Lake* and three FAP oil paintings that were displayed in the courtroom during the trial: Lawrence Lebduska's *Horses in a Dale*, DX 8, Margarette Carpenter's *Vegetables and Fruits*, DX 9, and Maxim Lubovsky's *Sleep*, DX 10.  The Court also heard testimony from three witnesses: Plaintiff Foster; Sean Flanagan ("Flanagan"), a Special Agent for the GSA-OIG who has recovered dozens of New Deal–era artworks on behalf of the United States Government; and Kathryn

Erickson ("Erickson"), a Fine Arts Management Specialist at the GSA with twenty-five years of experience cataloguing and identifying New Deal–era artworks.  On February 26, 2025, the parties submitted updated post-trial findings of fact and conclusions of law, Dkts. 113, 114, and on February 28, 2025, the Court heard closing arguments.

The Court will now set forth its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.  For the following reasons, the Court finds that the Painting belongs to the United States Government and directs that judgment be entered in favor of the Government on Plaintiff's Fifth Amendment claims.

**FINDINGS OF FACT**

The Court's findings of fact are contained in this background section, but are also integrated in its conclusions of law because some findings are more clearly described in the legal context in which they must be evaluated.

## I.    The Establishment and Work of the WPA and FAP

To combat the Great Depression, the United States Government created a number of federal relief programs during the New Deal era, including programs designed to support unemployed artists and the public arts.  Tr. at 101:7-23; *see also* Dkt. 112 ("SOF") ¶ 3.  One such program was the WPA's FAP.  SOF ¶ 3.

Through the Emergency Relief Appropriation Act of 1935, Congress appropriated $4 billion — today worth nearly $88 billion — for the President to use in his discretion "to provide relief, work relief[,] and to increase employment by providing for useful projects." Ch. 48, 49 Stat. 115, 115.  Section 4 of the Emergency Relief Appropriation Act provided that, in carrying out the provisions of the Act, the President was "authorized to establish and prescribe the duties and functions of necessary agencies within the Government."  *Id.* § 4, 49 Stat. at 118.

Pursuant to this authority, President Franklin D. Roosevelt established the WPA via executive order as a federal agency "responsible to the President for the honest, efficient, speedy, and coordinated execution of the work relief program as a whole."  Exec. Order No. 7034 (May 6, 1935), *reprinted in* 4 *The Public Papers and Addresses of Franklin D. Roosevelt* 163 (Samuel I. Rosenman ed., 1938); SOF ¶ 2.  That same year, the FAP was established under the WPA with dual objectives: to provide work relief to unemployed artists while creating a body of contemporary American art for "public use and enjoyment."  SOF ¶¶ 3-4; *see also* DX 6 at 64-65 ("The [WPA] art projects, it is generally agreed, preserved and encouraged the talents of many artists, created valuable art works for public enjoyment, and demonstrated the existence of a wide public interest in art."); Tr. at 123:1-9 (Erickson: "The [FAP] was a relief program where artists were pulled from relief roles . . . but when the artwork was turned in, it was to be . . . accessible for the public."); DX 32 at 2 ("It is the aim of the [WPA], through the employment of creative artists and workers in the art fields, to secure for public use and enjoyment outstanding examples of contemporary American art . . . . ").

Four years later, Congress passed the Reorganization Act of 1939, which authorized the President to reorganize executive agencies, including the WPA. Ch. 36, 53 Stat. 561. Section 4(d)(2) of the Reorganization Act required any reorganization plan to "make provision for the transfer or other disposition of the records, property (including office equipment), and personnel affected by such transfer, consolidation, or abolition."  *Id.* § 4(d)(2), 53 Stat. at 562.  Reorganization Plan No. 1 was promulgated pursuant to the Reorganization Act and placed the WPA under a newly established agency, the Federal Works Agency ("FWA").  *See* Reorganization Plan No. 1 of 1939, 4 Fed. Reg. 2727, 2729-30 (July 1, 1939), *reprinted in* 5 U.S.C. app. at 8, 10-11 (2023), *and in* 53 Stat. 1423, 1426-29;

SOF ¶ 5.  The WPA's name was changed from the Works Progress Administration to the Work Projects Administration, and the FAP was renamed the Works Projects Administration Art Program.[2]  SOF ¶¶ 5-6.

From 1935 to 1943, the FAP commissioned tens of thousands of pieces of art: more than 161,000 works of art were created, including murals, sculptures, prints, and 108,099 easel paintings.  DX 6 at 133; SOF ¶¶ 9-10.  The FAP loaned and allocated easel paintings to federal, state, and local government entities, tax-supported organizations, and nonprofit entities such as museums, hospitals, and schools.  SOF ¶ 13.  The effect of a loan or allocation was the same; the difference in nomenclature depended only on the recipient of the artwork. Tr. at 107:14-18 (Erickson).  Institutions like nonprofit entities that were not directly supported by tax funds received loans, while tax-funded governmental agencies and institutions received allocations.  *Id.* at 107:19-24 (Erickson).

In 1942, Florence Kerr, Assistant Commissioner of the WPA, wrote in a memorandum to state WPA administrators that "[p]ublic use shall be the determining factor in the disposition of work," adding that "[a]gencies with facilities for the circulation of work are the most desirable as permanent depositories rather than offices and similar locations, since in this way work will find greater public use."  DX 17 at 1; *see also* DX 15.  Kerr directed that "[w]ork shall not be disposed of in such manner that it will . . . pass into the hands of individuals or to organizations not eligible to receive allocations or loans."  *Id.*

FAP artworks were loaned or allocated to outside entities and organizations consistent with specific WPA policies and procedures.  SOF ¶ 13.  Whether providing a loan or allocation, the WPA informed recipients that artworks remained the property of the federal

---

[2] In this opinion, "WPA" is used to refer to both the Works Progress Administration and the Works Project Administration following the agency's renaming in 1939.

government and were not to be removed from the institutions to which they had been allocated or loaned. *See* DX 1 at 7; DX 2 at 5; DX 3; DX 4; DX 23 at 1-4 ("It is understood and agreed that the works remain the property of the United States Government and are not to be removed from the office or institution to which they are loaned."). Moreover, FAP artworks were not permitted to be sold, privately owned, or kept in private homes. *See, e.g.*, DX 3 (August 6, 1936 letter from WPA Director of Exhibitions: "We have received instructions that all pictures allocated to Federal offices must be delivered to those offices and are not to be removed."); DX 33 (March 4, 1937 letter from FAP employee: "I would be very particular that in no way do we convey to the public the impression that works produced under the program are for sale."); *see also* Tr. at 122:10-13 (Erickson: stating that easel paintings produced under the FAP were not "permitted to be loaned or allocated to private individuals"); *cf.* DX 49 (February 10, 1934 memorandum from government official stating that "great care should at the same time be exercised that none of these works [produced under a separate New Deal arts program] find the[ir] way, even on a loan, into private hands or buildings").

FAP paintings exhibited specific indicia of having been commissioned under the FAP program: FAP artists were required to sign each completed painting, and paintings were sometimes stamped with "WPA" or "Federal Art Project" stamps or stickers. SOF ¶¶ 11-12. Many completed artworks were photographed by the FAP Photographic Division, a component of the FAP, before they were loaned or allocated. SOF ¶ 14; Tr. at 128:4-129:5. Those photographs are currently maintained in the National Archives. Tr. at 128:12-14. FAP artwork was ordinarily framed to prepare it for loan, allocation, or exhibition. *See* Tr. at 210:13-17 (Erickson: testifying that she was not aware of any instances "[o]ther than exhibits and loans and allocations" when FAP works would be framed).

There were also specific policies and procedures for physically identifying completed FAP artwork prior to loaning or allocating the artwork to external institutions.  *See* DX 1 at 2-3; Tr. at 111:8-17 (identifying DX 1 as a memorandum "regarding the procedure for allocation of works of art"); DX 2 at 6; Tr. at 108:20-109:4 (identifying DX 2 as "procedures for the loan of artworks from the [FAP]"); SOF ¶ 15.  One such procedure required filling out a "record card," often referred to as "FAP #2" or "FAP Form 2," upon the completion of each painting that was to be loaned or allocated.  DX 1 at 3, 6; DX 2 at 5; DX 20 at 6-7; SOF ¶ 16.  The record card included information pertaining to the title, artist, medium, work project number, date received by the FAP, size, final allocation or loan recipient, the recipient's address, date shipped, current location of the painting, and the date of any scheduled exhibition.  DX 1 at 3, 6; DX 20 at 13; SOF ¶ 16.  If there was a long-term allocation or loan of a painting, the FAP required that the painting's record card be updated with the institution receiving the loan or allocation and forwarded to the FAP in Washington, D.C.  DX 1 at 3, 6; DX 2 at 5; SOF ¶ 17.

FAP procedures also required that a smaller-sized identification card, referred to as "FAP #3" or "FAP Form 3," be filled out and firmly affixed to the back of each painting to be loaned or allocated.  DX 1 at 3; DX 2 at 6; SOF ¶ 18; *see also* Tr. at 110:10-22.  Like the record card, the identification card included information regarding the artist, state, medium, title of work, and allocation or loan recipient.  DX 1 at 3, 5; DX 2 at 5; SOF ¶ 18.  The identification card also stated at the top, "FEDERAL ART PROJECT of the Works Progress Administration[,] Washington, D.C."  DX 1 at 5.  At the bottom of the identification card, it declared: "This work is the property of the United States Government" and is loaned or allocated "subject to regulations" of allocation or loan "and is not to be removed."  DX 1 at 5;

SOF ¶ 18.  The identification card contained a "FAP #3" notation in the upper left corner.

*See, e.g.*, DX 8 at 4; DX 9 at 2; DX 10 at 3; *see also* Tr. at 113:21-114:19.

FAP procedures for loans and allocations also required affixing a brass tag reading

"Federal Art Project" or "WPA Federal Art Project" to the lower center of the artwork's

frame.  DX 1 at 3; DX 2 at 6; DX 8 at 2; DX 9 at 1; DX 10 at 2; DX 20 at 9 ("A brass tage

[sic] reading (Name of State) 'WPA Art Program' shall be screwed to the lower center of the

frame or otherwise suitably attached to each work of art." (alteration in original)); SOF ¶ 19;

*see also* Tr. at 110:10-13, 114:20-23.

Finally, FAP operating procedures required that a receipt, referred to as "FAP #4" or

"FAP Form 4," be prepared in triplicate for works that were to be allocated or loaned.  DX 1

at 3; DX 2 at 6; SOF ¶ 20; *see also* Tr. at 109:16-110:3, 111:23-112:2.  Upon delivery of the

work to the public agency or institution receiving the allocation or loan, the "official

representative of the institution [was] to sign two copies, retaining the third unsigned copy for

his own record."  DX 1 at 3 (procedure for allocations); DX 2 at 6 (same procedure for loans);

SOF ¶ 21.  The receipt stated that the recipient "herewith acknowledge[s] receipt of the

following works of art [loaned or allocated] to us by the Federal Art Project of the Works

Progress Administration.  It is understood and agreed that the works remain the property of

the United States Government and are not to be removed from the office or institution to

which they are loaned [or allocated]."  *E.g.*, DX 23 at 1-4; DX 1 at 7.

## II.    The Termination and Liquidation of the WPA

In a letter dated December 4, 1942, President Roosevelt instructed the FWA

Administrator to "direct the prompt liquidation of the affairs of the Work Projects

Administration, thereby conserving a large amount of the funds appropriated to this

organization."  DX 6 at v.  Roosevelt noted that liquidation of the WPA would "necessitate

9

closing out all project operations in many States by February 1, 1943, and in other States as soon thereafter as feasible," and that there would be "no need to provide project funds for the Work Projects Administration in the budget for the next fiscal year." *Id.*

Pursuant to the directive to terminate WPA activities, the WPA enacted procedures for the "orderly disposition" of WPA surplus property. JX 28 at 1. Acting pursuant to congressional authority delegated to the executive branch, the Procurement Division of the Treasury Department was responsible for the disposition of surplus property. *See, e.g.*, *id.* at 8 (noting that, with narrow exceptions, "the Procurement Division alone has the authority to negotiate and order disposition" of surplus property); PX 29 at 1 (WPA Commissioner's Letter No. 92 dated February 27, 1943, noting the transfer of warehouses and property from the WPA to the Procurement Division); JX 30 at 1 ("The organization of the Procurement Division, including the regional procurement offices, has been developed to conform with the intent of the President to establish in one Federal agency, the function of determination of policies and methods of procurement of property as well as the control of all property that becomes surplus to the needs of any agency."). Therefore, "no employee of the [WPA] ha[d] the authority to negotiate with other Federal agencies for the transfer of WPA surplus property." JX 28 at 8.

State WPAs were advised to "start immediately" listing all property that was surplus to their needs on Procurement Forms 812 and to provide the forms to the Procurement Division. JX 28 at 4. Property deemed surplus included utilitarian items such as "equipment, materials, tools, and supplies" from WPA programs, DX 29 at 1, including office supplies, typewriters, industrial materials like rubber and metal, automotive equipment, and tools such as bolts, gaskets, and shovels, *see* DX 34 to 41 (listing various surplus property from WPA programs).

The Procurement Division set an order of priority with respect to the distribution of surplus property, with other components of the federal government first in line given wartime efforts: "[I]t is a first requisite of disposal, that Federal needs be satisfied prior to any other. After Federal needs are determined and filled pursuant to canvass of the several agencies, the property may be disposed of by sale in the public market."  JX 30 at 3.  Specifically, surplus property was to be distributed to: "1. Industries engaged in producing materials of war"; "2. Tax-supported organizations which because of the war have been denied materials and equipment essential to localized public requirements"; and then "3. Civilian requirements that have been curtailed or denied due to war necessities."  *Id.* at 3-4.

The Procurement Division's liquidation of WPA property included taking over a WPA warehouse in Corona, New York.  *See* PX 32 at 2; PX 53 at 1.  In a June 16, 1943 letter to Fred Curran, a journalist, the New York City Regional Procurement Officer stated that only "a small fraction of the total amount of property which remained for liquidation after eight years of WPA operations in New York City" remained at the Corona warehouse.  JX 27 at 2.  The remainder of materials at the warehouse had either been allocated toward the war effort or transferred to other units of the FWA, including the Public Roads Administration.  *Id.* at 1-2.

In a memorandum dated February 3, 1943, Holger Cahill, the Director of the WPA's FAP and Art Programs, detailed the allocation efforts at the Chicago Allocation Center as the WPA was winding down, specifically with respect to the WPA's Art Programs, including the FAP.  DX 18 at 1-2.  Cahill reported that "[a]ll but a small fraction of [WPA] work ha[d] found its way, through local sponsors, into colleges, schools, libraries, museums, hospitals, Army camps, Naval bases, and other public tax-supported institutions."  DX 18 at 1; *see also* Tr. at 150:22-151:12.  Cahill estimated that approximately 85,151 oil paintings and watercolors had been allocated to tax-supported institutions as of March 31, 1941, and that as

11

of February 1943, "more than one-third should be added to th[ose] allocation figures."  DX 18

at 1.  "The small amount of material still unallocated [was] mostly that which ha[d] been

circulated for exhibition purposes."  *Id.*; *see also* JX 5 (January 1943 memorandum from the

New York City WPA noting that only 324 oil paintings were available for allocation).

        The Final Report on the WPA Program, which was prepared and issued after the

liquidation of the program, provides an overview of the WPA's art projects and reinforces that

the WPA "created valuable art works for public enjoyment."  DX 6 at 64-65.  Easel paintings

are listed as among the "[p]hysical [a]ccomplishments" of the WPA.  *Id.* at 133; *see also* DX

16 at 1 (referring to the "enduring value for the civilization and record of our country" of FAP

artworks).  Given the enduring value of these works, significant efforts were undertaken by

the Government to continue to loan and allocate FAP artwork even as the project was winding

down.  *See* Tr. at 145:25-146:4; *see also* DX 12 (list of institutions "to which works of art

were allocated by the Central Allocation Section of the WPA Art Program in Chicago" from

January 1, 1943, to April 30, 1943); DX 16 (January 30, 1943 letter from WPA administrator

stating that "every possible care is being given in the allocation of [FAP] work to public tax-

supported institutions which will place it on exhibition for the widest possible use and

enjoyment"); Tr. at 150:5-11 (describing DX 16).  In January 1943, Assistant Commissioner

Kerr advised state WPA administrators that "[i]n connection with the termination of project

activities, it is important that all work produced by the former [FAP], WPA Art Program, and

the Graphic Services Phase of the War Services Program be allocated to eligible tax-supported

public institutions before February 1, 1943."  DX 13.  Kerr further instructed that "[a]llocation

should be encouraged especially to public schools, municipal or State institutions; to Army

camps, cantonments, and naval bases; to Army, Navy, and Marine hospitals; and to other

public tax-supported institutions which usually do not have funds for the purchase of works of

art." DX 13. In New York City, the number of institutions eligible for allocation far exceeded the "comparatively small number of oil paintings" left unallocated following the WPA's termination, prompting the State Supervisor for the New York City WPA War Services, Burgoyne Diller, to remark that "it will be essential to definitely limit the number of items to be allocated to any one agency." JX 5.

**III.    The GSA's New Deal Artwork Recovery Project**

The Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 101 *et seq.*, established the GSA, *id.* § 753(a), and transferred to the GSA "all records, property, personnel, obligations, and commitments" of all agencies of the FWA, Dkt. 112 at 17 ("SOL") ¶ 2. This included transferring to the GSA responsibility for stewardship of portable artworks owned by the federal government and created under the federal government's New Deal programs, including the FAP. SOL ¶ 3.

From the WPA's creation to the present day, artworks created under the WPA and other New Deal art programs have ended up in private hands through unauthorized means, including loss, theft, or improper disposal. *See, e.g.*, Tr. at 45:3-48:14, 156:17-21; 159:2-16; 160:18-161:7; *see also* DX 21; DX 22; DX 43 to 48; DX 58 to 59; DX 61. New Deal artwork has been stolen, lost, or discarded while in Government custody, while on loan or allocation to custodians, and while in the custody of institutions exhibiting the works. Tr. at 41:25-43:12, 49:22-50:9, 156:17-157:21, 159:2-16, 160:18-161:7, *see, e.g.*, DX 7; DX 21 to 22 (describing lost WPA paintings); DX 43 to 48 (describing WPA art recovery efforts by the GSA-OIG); DX 58 to 59; DX 61. Moreover, due to the passage of time and the restructuring and discontinuance of New Deal agencies, gaps exist in the records associated with these art programs. SOF ¶ 32.

The GSA, working with its Office of the Inspector General, implemented an ongoing program in the early 2000s for the purpose of identifying, cataloging, and recovering lost or stolen WPA and other New Deal Art Program artwork.  These recovery efforts are highlighted in a short documentary video entitled *Returning America's Art to America* that was created to educate the public about the Government's recovery efforts.  *See generally* DX 7; Tr. at 155:2-21 (describing DX 7).  GSA-OIG monitors and discovers the trading and sales of WPA artwork on online auction sites and is also notified of the potential identification of New Deal artworks by the general public and other interested third parties.  Tr. at 19:9-20:7, 40:2-6, 154:17-155:1.  When the Government learns of a potential WPA painting in private custody, it looks for physical indicators of WPA provenance on the painting, such as the FAP identification card affixed to the back of the painting, the artist's signature on the front or back of the canvas, the date of creation on the back of the canvas or frame, WPA or FAP insignia (for example, a stamp or other written marking) on the back of the canvas or the frame, the style and material of the frame, and/or the brass tag screwed to the frame.  SOF ¶ 34.

Ad Reinhardt's *Abstraction #6* is just one example of a WPA artwork that the GSA-OIG recovered from a private party.  Tr. at 42:8-43:20.  *Abstraction #6* ended up in private hands after the Art Director for the Port Richmond High School in Staten Island, New York, took the painting home while the high school was being renovated.  *Id.* at 42:8-20.  A family member subsequently sold the painting at Sotheby's Auction House.  *Id.*; *see also* DX 44 at 2; DX 58 at 1.  The GSA determined that the painting was commissioned by the FAP based on, among other things, the "New York City Art Project" inscriptions on the reverse of the canvas; the fact that Reinhardt was employed by the WPA and that the painting was created during the time that he was working for the New York City Art Project; and the absence of

any record of a sale or gift of the painting.  DX 58 at 1; *see also* Tr. at 43:13-20.  The GSA was not, however, able to locate loan documentation for the painting.  Tr. at 44:1-4.

On another occasion, GSA-OIG special agents retrieved New Deal–era artwork from the son of a former teacher at Clinton High School in New York, New York, after his mother had taken the artwork home for "safekeeping."  DX 43 at 3; *see also* DX 61 at 1 ("[T]hese works were a late 1930s traveling exhibition that came to be displayed at De Witt Clinton High School in the Bronx[,] New York. . . . Sometime in the 1980s [my mother] became chair of the [art] department and was given the keys to several storage areas . . . .").  Other examples of lost, stolen, and discarded New Deal artwork over the years abound.  *See, e.g.*, DX 21 at 1 (1939 letter from loan recipient informing WPA that two paintings were lost during an office move); DX 22 (newspaper article regarding the theft of a watercolor painting in the 1930s from an FAP exhibit in Boston); DX 45 at 2-3 (describing various recoveries of New Deal artwork); *see also* DX 46 to DX 48 (same).

Since the Recovery Program's inception, GSA and GSA-OIG have recovered more than 800 New Deal artworks.  Tr. at 106:12-14.  No possessor has ever provided the GSA with proof that a New Deal artwork was sold by the Government.  Tr. at 106:8-11.

## IV.    **Foster's Acquisition of *Lights Across the Lake***

*Lights Across the Lake* was created by Maxim Lubovsky in 1938.  SOF ¶ 38. Lubovsky worked for the WPA from September 1935 to February 1941.  *See generally* JX 6 (WPA work records for Maxim Lubovsky).

Foster is a retired teacher and former attorney residing in New York City.  SOF ¶ 39. Foster also has a doctorate in the History of Art, Tr. at 59:3-6, and started purchasing art to supplement his Social Security and retirement income, *id.* at 59:17-20.  In April 2013, Foster purchased *Lights Across the Lake* at an auction held by Jackson's Auctioneers & Appraisers

in Iowa for $1,200. JX 12; Tr. at 64:11-13, 86:4-6. He also paid a buyer's premium of $276, for a total purchase price of $1,476. JX 12.

On April 6, 2013, Foster contacted the Smithsonian Institution to learn more about the painting and was directed to the GSA's Fine Arts Program. PX 4 at 2-3. Julie Redwine of the GSA Fine Arts Program emailed Foster on May 2, 2013, stating that "Maxim Lubovsky completed work under the WPA Federal Art Project (1935-1942)," and asking for photographs of the Painting. *Id.* at 1. Foster responded to Redwine but does not appear to have ever sent the requested photographs. Tr. at 83:1-84:6.

Foster consigned the Painting to Swann Auction Galleries ("Swann") in New York, New York. Tr. at 72:1-73:2. In or around February 2021, the Painting was listed for sale in an auction at Swann. SOF ¶ 42. On February 4, 2021, Harold Porcher, a Director at Swann, sent GSA-OIG Special Agent Flanagan a link to the Swann auction listing for the Painting. Tr. at 51:12-16. That same day, Flanagan shared the link to the listing with Erickson, a Fine Arts Management Specialist in the GSA. SOF ¶ 54. Erickson reviewed the listing and the associated images of the Painting and determined that it was an FAP artwork, including because there was a digital photograph of *Lights Across the Lake* with the FAP's Photographic Division. Tr. at 129:6-131:3. The GSA subsequently hired a freelance researcher, Susan Strange, to research the Painting's chain of custody, including whether the Painting was loaned or allocated. Tr. at 131:8-132:3.

Erickson notified Flanagan that the GSA was looking for internal documentation pertaining to the Painting and advised that Swann should pull the painting from its auction. SOF ¶ 58. Flanagan subsequently reached out to Porcher and asked that the Painting be pulled from the auction "pending an official decision." PX 6 at 5; SOF ¶ 59. Porcher agreed. PX 6 at 4; SOF ¶ 60.

On February 4, 2021, Erickson located a photograph of the Painting in the GSA's national central archives.  SOF ¶ 61.  The back of the photograph of the Painting in the GSA's archives included the title (*Lights Across the Lake*), artist (Maxim Lubovsky), and medium (oil on canvas).  *Id.* ¶ 62.  The back of the photograph was stamped: "FEDERAL ART PROJECT W.P.A. PHOTOGRAPHIC DIVISION" and "NEWSPAPERS PLEASE CREDIT PHOTOGRAPHIC DIVISION FEDERAL ART PROJECT W.P.A."  *Id.* ¶ 62.  The same day, Erickson identified another Maxim Lubovsky painting commissioned under the FAP, which was on loan to the Genesee Valley Council on the Arts.  *Id.* ¶ 63.

On February 4, 2021, following Erickson's confirmation that the Painting was in fact commissioned under the WPA, GSA-OIG issued a Determination Letter to Swann, informing Swann that the GSA had determined that the Painting was commissioned by the WPA and was property of the U.S. Government.  SOF ¶¶ 64-65.  The Determination Letter indicated that the GSA was seeking to reclaim the painting and asked that Swann acknowledge the United States's claim of title and immediately release the painting to U.S. Government custody.  *Id.* ¶ 66.  In response, Swann withdrew the Painting from the auction.  *Id.* ¶ 67.  On July 14, 2021, the GSA-OIG issued an administrative subpoena directing Swann to produce the Painting, and the next day, Flanagan took possession of the Painting from Swann.  Tr. at 31:2-7; SOF ¶¶ 79-80.

On February 17, 2021, Foster emailed Sheryn Boos at Jackson's about the Painting, stating: "I purchased this painting from you in 2013; see below.  I recently offered this painting for sale at Swann's and they received . . . a notice from the U.S. government claiming they owned and loaned the painting, in which case it was stolen from them.  If true, then I am entitled to a refund from you, and you in turn from the consignor."  JX 15 at 6; Tr. at 86:12-15.  On March 3, 2021, Elizabeth Krambeer ("Krambeer"), Senior Client Services and

Marketing Associate at Jackson's, wrote: "If it goes so far, we will need a written letter illustrating that the GSA has taken possession of the work before we can begin the claim process on our end." JX 15 at 2. On April 5, 2021, Foster emailed Krambeer: "I would like you to make clear your position on this. Please confirm you will reimburse me if the government confiscates the painting." JX 16 at 1-2. A few weeks later, on April 20, 2021, Foster followed up when he had not received a response: "Its [*sic*] almost a month now; I hope I am not going to have a problem with you." *Id.* at 1. Krambeer replied: "No problem here! We've spoken with the person who consigned the painting to us, and we along with them are prepared to respond accordingly if the US government does take possession of the work." *Id.* On July 26, 2021, Krambeer wrote to Foster that "as soon as [she] received the order" she would "present everything to [Jackson's] accounting department." JX 13 at 1. Foster replied the same day, writing: "Thanks. I don't want you to proceed just yet because I think the painting should be returned and maybe sold if it is worth more than I would receive from you, so lets [*sic*] wait on this to see what they come up with to prove they are entitled to keep it." *Id.* To date, Foster has not submitted any claim or request to Jackson's for reimbursement concerning the Painting. SOF ¶ 85.

The Painting is currently on loan to the Genesee Valley Council on the Arts. SOF ¶ 92; Tr. at 143:19-24.

## CONCLUSIONS OF LAW

Foster's only remaining claims are Fifth Amendment Due Process and Takings Clause claims against the United States. Under either claim, Foster must demonstrate that he had a valid property interest in *Lights Across the Lake* to prevail. *See, e.g.*, *Furlong v. Shalala*, 156 F.3d 384, 393 (2d Cir. 1998) (observing that a "legitimate claim of entitlement" is a prerequisite for a Fifth Amendment due process claim (quoting *Bd. of Regents of State Colls.*

*v. Roth*, 408 U.S. 564, 577 (1972))); *Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992) (claim under either the Due Process or Takings Clause requires showing a deprivation of a "protected property interest"). The parties agree that the Painting was created under the FAP such that, when created, it belonged to the Federal Government. SOL ¶ 8. They disagree, however, with respect to whether the Government subsequently extinguished its title to the Painting. As stated previously, the parties have stipulated that, in the event the Court determines that Foster holds title to the Painting, and if that determination is affirmed following the completion of all available appeals, the Government will return the Painting to Foster under the condition that return of the Painting fully satisfies Foster's claims in this action. Tr. at 12:8-10; Dkt. 95 at 12.

Therefore, the only issue now before the Court is whether Foster or the Government owns *Lights Across the Lake*. The parties also agree that, for purposes of this inquiry, the burden of proof rests with Foster: Foster must show, by a preponderance of the evidence, that he holds title to the Painting because the Government explicitly relinquished its ownership rights. SOL ¶ 9; Tr. at 249:1-5.

To resolve the ownership question presently before the Court, the Court first turns to an overview of the jurisprudence governing federal property ownership.

## I.    Federal Property Ownership

The Constitution gives Congress the power to establish rules governing the property of the United States. *See* U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."). Property as used in Article IV, Section Three, encompasses "all other personal and real property rightfully belonging to the United States." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 331 (1936) (citation omitted). From this

grant of authority, the Supreme Court has held that "Congress has the power to provide for the disposition of property of the United States, and the power must be exercised by the authorized authority, and in the authorized manner . . . ." *Kern Copters, Inc. v. Allied Helicopter Serv., Inc.*, 277 F.2d 308, 313 (9th Cir. 1960) (citations omitted); *see also Alabama v. Texas*, 347 U.S. 272, 273 (1954) (per curiam) (holding that the "power of Congress to dispose of any kind of property belonging to the United States 'is vested in Congress without limitation'" (quoting *United States v. Gratiot*, 39 U.S. 526, 537 (1840))); *United States v. Allegheny County*, 322 U.S. 174, 182 (1944) ("Every acquisition, holding, or disposition of property by the Federal Government depends upon proper exercise of a constitutional grant of power.").  The United States therefore cannot relinquish its property absent authorization from Congress.  *See United States v. California*, 332 U.S. 19, 39-40 (1947).  As the Supreme Court explained in *Royal Indemnity Co. v. United States*:

> Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution.  Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted.

313 U.S. 289, 294 (1941) (citation omitted).

Moreover, the United States Government cannot relinquish its property "except by explicit acts." *United States v. Steinmetz*, 973 F.2d 212, 222 (3d Cir. 1992); *see also Int'l Aircraft Recovery, LLC v. Unidentified, Wrecked & Abandoned Aircraft*, 218 F.3d 1255, 1258 (11th Cir. 2000) ("As courts consistently have recognized, the federal government cannot abandon property absent an affirmative act authorized by Congress.").  Therefore, principles that impact a title holder's rights in a private property dispute cannot deprive the federal government of its ownership interest in property.  *California*, 332 U.S. at 40; *see also Kern Copters*, 277 F.2d at 313.  *United States v. California* further elucidates these principles:

> The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches or failure to act.

332 U.S. at 40.  Inactivity or neglect by government officials therefore does not divest the United States of its ownership interest in property.

*United States v. Steinmetz* underscores the high threshold for the Government's relinquishment of title.  973 F.2d 212.  In *Steinmetz*, the parties disputed title to a brass bell retrieved from a Confederate Navy vessel sunk by the Union Navy off the coast of France in 1864.  *Id.* at 214.  The Court held that the bell was the property of the United States Government, notwithstanding the fact that the bell had remained submerged until a British diver recovered it over seventy years later, in 1936.  *Id.* at 215, 223.  Finding that the United States succeeded to the ownership of the Confederate vessel after the conclusion of the Civil War, the Court rejected the defendant's contention that the United States had "abandoned the ship in the depths of the briny sea."  *Id.* at 221-22.  Relying on the Property Clause of the Constitution and the Supreme Court's decision in *United States v. California*, the Court underscored that the "United States cannot abandon its own property except by explicit acts." *Id.* at 222.  That the Government "never asserted ownership" over the vessel or "showed any interest in its salvage" did not amount to a voluntary and explicit relinquishment of the Government's title — even if decades had passed since the vessel's sinking.  *Id.*

Applying these same precedents and principles, the Eleventh Circuit in *International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked & Abandoned Aircraft* held that the Government retained title to a Navy torpedo bomber that had crashed decades earlier.  218 F.3d at 1256-57.  Following the plane's crash in international waters in 1943, the Navy

"struck" the plane from its inventory of active aircraft.  *Id.* at 1257.  Years later, in the 1990s,

a private collector who had salvaged parts of the plane sought to secure exclusive salvage

rights.  *Id.*  The private collector maintained that the Government abandoned all interests in

the plane when it struck the bomber from its inventory.  *Id.* at 1258-59.  The Eleventh Circuit

was not so persuaded, holding that, "absent an affirmative act authorized by Congress," the

federal government could not so readily abandon its property interests.  *Id.* at 1258.

Similarly, in *United States v. Maritime Exchange Museum*, the Eastern District of

Michigan held that two lighthouse lenses that had somehow fallen into the stream of private

commerce were still United States property.  303 F. Supp.3d 546, 549 (E.D. Mich. 2018).

The parties agreed that the lenses were originally property of the United States.  *Id.*  The only

dispute was whether subsequent events divested the Government of its ownership interest.  *Id.*

While the precise chain of custody of the lenses was not clear, the Court held that there was

"no evidence of authorized ownership extinguishing acts" by the Government, "despite a

reasonably diligent effort by both sides."  *Id.* at 552.  To the contrary, "[t]he absence of any

record, viewed in light of then applicable law, confirm[ed] that no authorized action was taken

to extinguish the Government's ownership interest in the lens."  *Id.* at 550.

Likewise here, the parties do not dispute, and the Court so finds, that *Lights Across the

Lake* was created as part of the WPA's FAP program and therefore belonged to the

Government at the time of its creation.  The Painting was photographed by FAP's

Photographic Division, and a photograph of the Painting is maintained to this day in the

National Archives.  Tr. at 128:4-129:8; *see also* JX 2; DX 5.  The back of the photograph

from the National Archives states the Painting's title (*Lights Across the Lake*), artist ("Maxim

Lubovsky"), and medium (oil on canvas).  JX 2 at 2.  The Painting is also stamped:

"FEDERAL ART PROJECT W.P.A. PHOTOGRAPHIC DIVISION" and "NEWSPAPERS

PLEASE CREDIT PHOTOGRAPHIC DIVISION FEDERAL ART PROJECT W.P.A." *Id.*
Maxim Lubovsky was also working for FAP at the time that *Lights Across the Lake* was
produced.  Tr. at 128:4-10, 132:4-9; JX 3 at 1; JX 4 at 2.

Since it is undisputed that *Lights Across the Lake* was Government property at the
time of its creation, the sole question before this Court is whether the Government undertook
"authorized and explicit acts" to divest itself of its ownership interest therein.  *Mar. Exch.
Museum*, 303 F. Supp. 3d at 550.  Unless Foster can affirmatively prove that the Government
explicitly and lawfully relinquished its rights to *Lights Across the Lake*, the United States
continues to hold title to the Painting.  *See, e.g.*, *Steinmetz*, 973 F. 2d at 212, 222-23
(observing that Government's interest in property cannot be extinguished "except by explicit
acts"); *Kern Copters*, 277 F.2d at 313 (requiring "affirmative evidence" of Government's
extinguishment of title).  The afore-mentioned precedent makes clear that Foster's burden to
prove an intentional and voluntary divestment of the Government's property interest is a
demanding one.

The Court therefore first considers whether Congress authorized the WPA or any other
agency to sell WPA property (including FAP artwork), and if so, whether the evidence
supports a finding of an explicit, authorized government sale of FAP paintings generally, and
of Lubovsky's *Lights Across the Lake* in particular.

## II.    Congress Authorized the Sale of WPA Surplus Property

The parties do not dispute that Congress delegated authority to the WPA to dispose of
its property and that, following President Roosevelt's termination of the WPA in December
1942, the Procurement Division of the Treasury Department was authorized to liquidate
WPA's surplus property, including — under certain circumstances — by selling surplus
property to the public.  Tr. at 228:22-25 (Plaintiff: "[T]he WPA did have statutory authority to

dispose of its property, and did so by turning its inventory over to the Procurement Division of the Treasury Department when the WPA was liquidated."); *id.* at 252:12-25 (Government: agreeing that the WPA and Procurement Division were "legally authorized" to sell surplus property); *see also id.* at 301:12-15.  The Court agrees.

Congress can delegate its legislative power to dispose of and make rules and regulations respecting government property to its coordinate branches, so long as it sets forth an "intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform."  *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).  As the Supreme Court explained:

> In determining what [Congress] may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination. The field of Congress involves all and many varieties of legislative action, and Congress has found it frequently necessary to use officers of the executive branch within defined limits, to secure the exact effect intended by its acts of legislation, by vesting discretion in such officers to make public regulations interpreting a statute and directing the details of its execution . . . .

*Id.* at 406.

A series of regulations, executive orders, and policies issued in the 1930s and 1940s vested authority in the Procurement Division of the Treasury Department to dispose of federal surplus property.  On March 3, 1933, in response to the Great Depression, Congress authorized the President to "investigate the present organization of all executive and administrative agencies of the Government," and to "determine what changes therein are necessary" to reduce expenditures and increase efficiencies.  Act of March 3, 1933, ch. 212, § 401, 47 Stat. 1489, 1517.  Specifically, Congress authorized the President to transfer, consolidate, or abolish the whole or any part of any agency by executive order, "mak[ing] provision for the transfer or other disposition of the records, property (including office

equipment), and personnel, affected." *Id.* § 404.  Pursuant to this authority, President

Roosevelt issued Executive Order No. 6166, which granted the Procurement Division of the

Treasury Department control over surplus property, effective December 31, 1933.  Exec.

Order 6166 (June 10, 1933)[3]; Exec. Order No. 6224 (July 27, 1933).[4]  In the 1930s, the

Procurement Division issued regulations and procedures directing agencies to report

serviceable surplus property to the Director of Procurement, who would maintain surplus-

property lists and permit representatives of other executive departments to select desired

items.  *See, e.g.*, DX 24 at 7 ("The Director of Procurement will coordinate and supervise the

disposition of surplus Government property and of property seized by the Government when

turned over to him by competent authority."); DX 26 § B ("All serviceable property (personal

as distinguished from real) located outside the District of Columbia becoming surplus and no

longer required by the holding activity will be reported to the Procurement Division, in

triplicate, giving a description and statement of the condition of the property, and if possible,

the value at which each item is carried on the books or the appraised value.").

The WPA, in turn, was endowed with authority to dispose of its own property,

including through loans and allocations, by virtue of the Emergency Relief Appropriation Act

of 1935, the Reorganization Act of 1939, and presidential directives promulgated thereunder,

including President Roosevelt's December 1942 directive to discontinue the WPA.

Considered together, these statutes and presidential directives reflect that the President,

exercising authority delegated by Congress, endowed the WPA with broad authority to

provide work relief through projects like the FAP.

---

[3] https://www.archives.gov/federal-register/codification/executive-order/06166.html
[https://perma.cc/UYX5-WT7M].

[4] https://www.presidency.ucsb.edu/node/362047 [https://perma.cc/M8QN-2ZS6].

Following President Roosevelt's termination of the WPA, the WPA turned its property over to the Procurement Division. *See, e.g.*, DX 60 at 1 (February 8, 1943 letter from WPA's Deputy Commissioner to state WPA administrators: "[The WPA's] actions in this regard are governed to a large extent by the authority of other Federal agencies."). The Procurement Division thereafter assumed responsibility over the disposition and liquidation of WPA's surplus property. *See, e.g.*, JX 28 at 4 (January 21, 1943 letter from WPA Director of Supply to state WPA administrators and field finance officers: "When Federal agencies other than the [FWA] submit communications or inquiries regarding the acquisition of WPA surplus property, they shall be advised that the [WPA] is without authority to make commitments and that the matter should be referred to the Procurement Division."); PX 29 at 1 (February 27, 1943 letter from WPA Deputy Commissioner announcing transition of "WPA warehouses, subwarehouses, storage lot[s,] and other stocks of property stored therein" to the Procurement Division of the Treasury Department); JX 30 at 1 (November 18, 1943 memorandum: "[T]he Procurement Division of the Treasury Department is the agency authorized to dispose of Federal surplus personal property."); PX 48 at 3 (March 6, 1943 letter from WPA Director of Supply to state WPA administrators noting the transfer of warehouses, property, and supply section personnel to the Procurement Division); *see also* PX 26; PX 31; PX 33; PX 46 § 2(F); PX 49 at 1.

In overseeing the disposition of WPA's surplus federal property, the Procurement Division acted in accordance with authority vested in the executive branch by the First War Powers Act and subsequent Bureau of the Budget regulations. *See* PX 43 at 4. The First War Powers Act delegated broad authority to President Roosevelt to "make such redistribution of functions among executive agencies as he may deem necessary." Pub L. No. 77-354, § 1, 55 Stat. 838, 838 (1941). Acting pursuant to the authority vested in him by the First War Powers

Act, Roosevelt issued Executive Order 9235 authorizing the Director of the Bureau of the Budget to require, when necessary, "the transfer from one Government agency to another, for permanent or temporary use, of such supplies and equipment as he may determine to be surplus to the needs of one agency and essential to the needs of another agency." Exec. Order No. 9235, 7 Fed. Reg. 6987, 6987 (Sept. 4, 1942). The executive order directed the Procurement Division to "take over" all government agency warehouses to exercise control over the storage, rehabilitation, and distribution of government supplies and equipment. *Id.* Surplus property, such as "scrap or junk" not desired by other federal agencies, could be sold at public offering to bidders. JX 29 at 1-2. On November 16, 1942, the Bureau of the Budget, acting under Executive Order 9235, issued regulations prescribing further procedures for designating and disposing of surplus federal property. *See generally* DX 28.

By Executive Order 9425, pursuant to the First War Powers Act, the President transferred responsibility over surplus property to the newly created Surplus War Property Administration. Exec. Order No. 9425, 9 Fed. Reg. 2071, 2071 (Feb. 23, 1944). The establishment of the Surplus War Property Administration, did not, however, disturb existing procedures for the disposal of surplus property. *See* DX 31 at 2. Pending the issuance of further instructions, federal agencies continued to receive priority with respect to the distribution of surplus property. *Id.*

Following the conclusion of World War II, federal agencies continued to dispose of surplus federal property in accordance with laws and regulations. On October 3, 1944, Congress passed the Surplus Property Act of 1944 "[t]o aid the reconversion from a war to a peace economy through the distribution of Government surplus property and to establish a Surplus Property Board to effectuate the same." Pub. L. No. 78-457, pmbl., 58 Stat. 765, 765. The Surplus Property Board was charged with "(1) care and handling and disposition of

surplus property, and (2) the transfer of surplus property between Government agencies." *Id.*

§ 6.  Consistent with prior federal regulations for the disposition of surplus property, the Act

specified that the federal government had "priority over all other disposals provided for in this

Act," *id.* § 12(a), followed by local governments, *id.* § 13(f).  The Surplus Property Board was

subsequently replaced by the Surplus Property Administration by the Act of September 18,

1945, Pub. L. No. 79-181, 59 Stat. 533, and on January 31, 1946, the President transferred all

of the Surplus Property Administration's functions, including its authority over surplus-

property disposal, to the War Assets Administration, Exec. Order No. 9689, 11 Fed. Reg.

1265, 1265 (Feb. 2, 1946).

Congress ultimately established the GSA, to which all the FWA and War Assets

Administration's functions were transferred.  The GSA's regulations, which remain in effect

today, reiterated that "[t]itle to Government-owned personal property cannot be transferred to

a non-Federal entity unless through official procedures specifically authorized by law."  41

C.F.R. § 102-35.30(d).  The GSA also maintained the order of priority with respect to eligible

recipients for surplus property, that is, GSA regulations prioritize the transfer of surplus

property to other federal components and agencies.  *Id.* § 102-36.35.

Taken together, these statutes, regulations, and presidential directives support the

finding that the President, exercising authority delegated from Congress, endowed the WPA

with broad authority, including to acquire and dispose of property through its projects.  When

the WPA was terminated and its property was liquidated, the Procurement Division — as the

federal agency responsible for overseeing control and disposition of surplus federal

property — was in turn responsible for the liquidation of WPA's surplus property.  Like the

WPA, the Procurement Division's authority over federal property derived from

congressionally authorized executive orders and federal regulations, including Bureau of the

Budget regulations enacted pursuant to the First War Powers Act.  Indeed, a February 22, 1943 memorandum from the Procurement Division's Chief Counsel confirms the Procurement Division's legal authority to control and dispose of WPA's surplus property, citing, among other things, Executive Order 9235 and the Budget of the Bureau regulations promulgated thereunder.  *See* PX 43 at 4.

The Court therefore finds that the WPA, and subsequently the Procurement Division, had the legal authority to sell WPA "surplus" property, so long as any sales were conducted consistently with the operative laws, regulations, and implementing procedures then in effect.

### III. Explicit Authorized Sales of WPA Property

Given that the WPA and, later, the Procurement Division had the authority to dispose of surplus WPA property, the next question for this Court is whether there was an explicit authorized sale of FAP artwork and, specifically, of *Lights Across the Lake*.

Foster argues that, pursuant to authority granted to the WPA by Congress and delegated to the Treasury Department's Procurement Division, surplus property — including completed FAP oil paintings — were sold to private parties following the liquidation of the WPA in 1942.  Tr. at 8:7-9:18 (Plaintiff's Opening).  According to Foster, the weight of the evidence shows that *Lights Across the Lake* was more likely than not sold in one such surplus sale out of a warehouse in Corona, New York.  Tr. at 9:2-6 (Plaintiff's Opening).

The Government in turn argues that *Lights Across the Lake* was loaned or allocated pursuant to FAP policies and procedures.  According to the Government, the Painting was not part of any surplus sale and its subsequent entry into the private market was likely through an unauthorized act, such as loss or theft.  *See* Tr. at 13:2-12, 16:25-17:13 (Government's Opening).

For the reasons set forth below, the Court finds that Foster has not satisfied his burden to prove that the United States sold or otherwise explicitly relinquished its title to *Lights Across the Lake*.

### A.  The Sale of FAP Artwork Generally

As a threshold matter, the Court first considers whether the weight of the evidence establishes that the Government explicitly authorized the sale of any completed, professional FAP artwork following the WPA's termination and liquidation.  As set forth above, the Procurement Division had the authority to dispose of surplus federal property.  Federal regulations and procedures provided that this included the authority, under certain circumstances, to dispose of surplus property — including surplus WPA property — through sales to the public.  *See, e.g.*, JX 29 at 4 (Procurement Division procedures regarding the sale of public property after public offering); JX 30 at 3-4 (Procurement Division procedures for the sale of surplus property); PX 27 at 2 (Procurement Division procedures providing for sale to commercial channels); PX 30 at 2 (May 18, 1943 letter noting sales of WPA inventory by the Procurement Division); PX 34 (May 14, 1943 letter to potential purchaser of WPA property); PX 37 at 3 (January 1, 1944 letter noting sales of surplus property, including WPA property, "to the general public").  But whether these surplus sales included completed FAP artworks by commissioned artists is a separate question.  The record here shows that although the surplus sales that took place during the WPA's liquidation may have included sales of some FAP canvases, paintings, and materials — including unfinished pieces or otherwise unallocatable artwork — it is highly unlikely that there were authorized sales of completed, professionally commissioned, and framed FAP paintings like *Lights Across the Lake*.

First, FAP artwork was government property and intended to be displayed for the "public use and enjoyment," DX 32 at 2, not sold or privately owned.  Sales of completed,

commissioned FAP artwork to private buyers would have been contrary to the program's goals of bringing a body of contemporary artwork to the American public.  *See, e.g.*, Tr. at 122:24-125:20, 126:24-127:8.  Numerous WPA policies, procedures, and memoranda reflect that the Government intended that WPA artwork be kept in public institutions as opposed to sold to citizens or otherwise privately owned.  For instance, WPA operating procedures dated January 10, 1940, provided that, upon completion, works of art could be "(1) placed upon exhibition in local community art centers or galleries, (2) placed in state or national exhibitions, or (3) allocated or loaned to public agencies."  DX 32 at 6; *see also* DX 1 (procedures for loans and allocations); DX 2 (same); DX 3 ("We have received instructions that all pictures allocated to Federal offices must be delivered to those offices and are not to be removed.  The pictures . . . remain government property . . . ."); DX 17 at 1 ("Public use shall be the determining factor in the disposition of work."); DX 32 at 13 ("Care shall be exercised to insure [*sic*] that allocations or loans of works of art do not compete with private markets."); DX 14 to 16 (instructing care be taken to allocate work to public tax-supported institutions); DX 20 at 4-6 (directing care be taken to keep allocations or loans of art from "compet[ing] with private markets"); DX 33 (warning that state FAP director not "convey to the public the impression that works produced under the program are for sale").

Consistent with these objectives, the WPA prioritized loans and allocations of FAP artworks to public and tax-supported institutions and continued to do so even after the termination of the program.  In a January 30, 1943 letter to the Assistant Chief for the Section of Fine Arts, Public Buildings Administration, Kerr wrote that "every possible care is being given in the allocation of [FPA] work[s] to public tax-supported institutions which will place it on exhibition for the widest possible use and enjoyment."  DX 16 at 1; *see also* Tr. at 145:25-146:4; JX 5 (January 12, 1943 letter planning reallocation of FAP artwork); DX 12 at

1-3 (listing institutions to which works of art were allocated by the Central Allocations Section of the WPA Art Program in Chicago between January 1, 1943, and April 30, 1943); DX 13 (January 12, 1943 memorandum from the FWA to state administrators: "In connection with the termination of project activities, it is important that all work produced by the former [FAP] . . . be allocated to eligible tax-supported institutions before February 1, 1943."); DX 15 (letter from Kerr to California project administrator: "In connection with the termination of project activities, it is important that all work produced by the former [FAP], WPA Art Program . . . be allocated to eligible tax-supported public institutions before February 1, 1943.").  By the time the agency was winding down in 1943, all but a "small fraction" of works had been placed, through local sponsors, in colleges, schools, libraries, museums, hospitals, and other public tax-supported institutions.  DX 18 at 1.  As for the "comparatively small number of oil paintings" that remained unallocated in New York City upon the program's close, there were a "large number of eligible" agencies and institutions in which those works could be placed.  JX 5.  Given the WPA's renewed efforts to loan or allocate any outstanding artworks upon the agency's termination, it is highly unlikely that such works were instead sold through public auction.[5]  Nor would completed FAP professional artwork fall within the meaning of "surplus property" as ordinarily defined in laws and implementing procedures during the relevant time period.  Laws and procedures

---

[5] The WPA's general prohibition on private ownership of FAP artworks also conforms with current laws and regulations, which provide that Government-owned artwork cannot be designated or sold as "surplus" or "excess" property.  GSA regulations provide that federal records are not eligible for transfer outside of the federal government.  41 C.F.R. § 102-37.40(f).  Instead, federal records, including "historical materials" such as "works of art" with "historical or commemorative value," 44 U.S.C. § 2101(2), are governed by the statute establishing the National Archive and Records Administration ("NARA") and its implementing regulations, *see id.* § 2102; 36 C.F.R. §§ 1200.1-1290.8, and must be preserved thereunder, *see* 44 U.S.C. §§ 2107, 2108, *see also* 36 C.F.R. §§ 1235.42(c)(4), 1237.12(c)(4).

from the 1930s and 1940s typically described surplus property as property with no further value or use as to those objectives for which it was originally acquired. *See, e.g.*, DX 27 at 1; Surplus Property Act § 3(e), 58 Stat. at 767 (defining surplus property as "any property which has been determined to be surplus to the needs and responsibilities of the owning agency in accordance with section 11"); Exec. Order No. 6166 § 1, *supra* ("The Procurement Division shall also have control of all property, facilities, structures, machinery, equipment, stores, and supplies not necessary to the work of any agency . . . ."); Exec. Order No. 9235, 7 Fed. Reg. at 6987 (authorizing transfer of "supplies or equipment" deemed "surplus" to needs of agency); Exec. Order No. 9425, 9 Fed. Reg. at 2072 (defining "Surplus War Property" as "any property, real or personal, including but not limited to plants, facilities, equipment, machines, accessories, parts, assemblies, products, commodities, materials, and supplies in the possession of or controlled by any Government agency . . . which are in excess of the needs of such agency or are not required for the performance of the duties and functions of such agency."); 40 U.S.C. § 102(10) ("The term 'surplus property' means excess property that the Administrator determines is not required to meet the needs or responsibilities of all federal agencies."); 41 C.F.R. § 102-36.40 ("Surplus personal property (surplus) means excess personal property no longer required by the Federal agencies as determined by GSA."). Completed, professionally commissioned FAP artworks were not lacking in value or use upon the agency's termination; to the contrary, FAP artworks continued to have "enduring value," DX 16, including because they continued to facilitate "public use and enjoyment," DX 32 at 2. For precisely that reason, as set forth above, the WPA continued to loan and allocate FAP artworks to public institutions even as it was winding down. FAP artworks therefore did not cease to serve their original purpose merely because the agency under which they were commissioned was terminated.

That completed FAP artwork would not have been considered surplus material is further borne out by the archival evidence. Surplus property circulars and catalogs from the 1930s and 1940s include almost exclusively utilitarian items such as office supplies and furniture, typewriters, industrial materials like rubber, metal, and other hardware, and tools such as bolts, drills, and shovels. *See, e.g.*, DX 34 to 41. None of the circulars introduced at trial included WPA artworks of any kind. Documents discussing the liquidation of WPA surplus property likewise referred to the need to dispose of "equipment, materials, tools, and supplies." DX 29; *see also* PX 47 (referencing the transfer of some 60,000 units from the Corona, NY warehouse, including "such critical materials as lumber, machine tools, sheet metal equipment, cutting tools, [and] small tools").

However, even if the WPA had designated completed, professional artwork commissioned under the FAP as surplus, under federal statutes, regulations, and policies, surplus property was not sold to private purchasers without first being offered to other federal agencies and tax-supported entities. JX 28 §§ 6, 8; Pub. L. No. 78-457, 58 Stat. 765 §§ 12, 13; 41 C.F.R. § 102-36.35. Sales to civilians were last in the order of priority — further diminishing the likelihood that completed, commissioned FAP artworks would have entered the private market through authorized surplus sales. *See* JX 30 at 3 ("In the absence of legislation to the contrary, it is the first requisite of disposal, that Federal needs be satisfied prior to any other."); DX 31 at 2 (April 1, 1944 Memorandum from Thurman Hill, Chief Counsel, Procurement Division, to Clifton E. Mack, Director, Procurement Division: "In the absence of an authorization from the Surplus War Property Administration . . . it is my opinion that we are bound to give preference to the requirements of Government agencies."); JX 27 at 2 ("After such needs [of the war effort and tax-supported entities] have been

completely satisfied, it is contemplated that sale will be made to individuals for use in private enterprise not directly connected with the war effort.").

The Court also credits the testimony of Erickson, who credibly represented that, in her twenty-five years of experience researching and recovering WPA paintings, she was not aware of any document memorializing a sale of any WPA artwork by the Government.  Tr. at 104:24-105:1; 106:3-11; 144:12-15.  For this case alone, the Government devoted approximately 250 hours of research in the National Archives and reviewed hundreds of thousands of National Archive documents, searching for any documentation relating to the sale of artwork by the Government.  Tr. at 152:11-15.  The Government did not locate a single bill of sale, documentation of title transfer, or receipt memorializing any sale of WPA artwork, nor any surplus property declaration listing artwork as surplus.  Tr. at 144:12-15, 154:8-11, 166:8-13.  Moreover, during Erickson's twenty-five year tenure with the GSA, no possessor has provided proof that an artwork was sold by the Government.  Tr. at 106:8-17.

The documents upon which Foster relies do not alter the Court's conclusion.  Foster overreads a February 1943 letter from Philip Fleming, Major General, Acting Commissioner of Work Projects, to Harold D. Smith, Director of the Bureau of the Budget, in which Fleming represents that, other than "equipment, supplies, and material" needed for the war effort, "all other WPA property is being declared surplus to needs" with the Procurement Division.  PX 26 at 1; *see also* Tr. at 230:1-10.  Fleming's letter makes no reference at all to WPA artworks, which, because of their historical value, would have been distinct from other materials and equipment the agency was disposing of at its termination.  Moreover, as noted above, there is substantial evidence that WPA artwork was not in fact automatically deemed surplus at the agency's termination, but instead continued to be allocated and loaned to public and nonprofit institutions.  When Congress has elsewhere sought to deem all outstanding agency property

"surplus" following an agency's dissolution, it has done so expressly. For example, following the termination of the New York Youth Administration — another New Deal agency discontinued in 1943 — Congress declared "all real and personal property of the National Youth Administration" surplus. *See* Second Deficiency Appropriation Act of 1943, Pub. L. No. 78-140, 57 Stat. 537, 539. Congress therefore directed the transfer of "all equipment, materials, and supplies" to the Director of Procurement. *Id*. No such law was passed with respect to the WPA.

Foster principally relies on a number of accounts, found primarily in letters, news articles, magazines, and books, of the Government selling some subset of unspecified WPA artwork upon the liquidation of the agency. *See, e.g.*, PX 7-15, 18-19, 44.

For instance, a handwritten letter dated January 8, 1944, from Joseph Solman to Jacob Kainen, both WPA artists, stated in relevant part:

> Well the mystery of WPA art is cleared up. All the oils stored in King St + adjacent warehouses showed up in a second hand bric a brac shop down on Canal St. Herb Benevy first heard of it and grabbed up some 250 oils (first choice) at the special price of $5 a canvas. I hurried down, recovered four really good ones of mine as well as several for Jules, for Nisonoff + Alice Neel. I could have grabbed some fair stuff for turnover but I'm not inclined to be commercial at the present time. Benevy will make a nice scoop on his lot although he picked up much crap. Most of the stuff still lies in back of this junk shop on the floor without benefit of stretchers — just one huge coffin. I had to leave several of mine that had been blasted beyond anyone's repair. It seems that when WPA liquidated there were no funds for storage and they sold everything from all kinds of projects to dealers.

PX 12, at 1-3.

An article in the February 15, 1944 issue of the *Art Digest*, entitled *End of the Project*, referenced an auction of canvases from a government warehouse in Flushing:

> Early in December, a junk dealer drove his truck up before the Roberts Book Co. on Canal Street in New York, sold the proprietor, at a price determined by weight, a ton of canvases that once were easel paintings. They were off the stretchers, wrapped in dirty and mildewed bundles. Left over as "unallocatable"

from the WPA Art Project that closed in April, they had been auctioned as junk from a government warehouse in Flushing along with old copper and scrap iron a day or two before. Many were by artists of well established reputations and museum representation, and were variously stamped on the back: Federal Art Project, Property of the N.Y. Dept of Health, FAP, and WPA. The sale was perfectly legal under existing laws and was probably arranged through the Procurement Division, although there had been assurances less than a year ago that none of the property would be sold.

PX 7 at 2. The reporter had learned of the sale "through a weekly broadcast," which in turn had "learned of it from a[n] artist . . . who had stumbled on these thousands of paintings stacked and scattered at random in the back of Mr. Roberts' shop, and had bought 400 of them at from $3 to $5 apiece." *Id.* The article reported that Audrey McMahon, Director of the New York Region of the WPA Art Program, "disclaimed any knowledge of anything — including the fact that sale was legal," and stated that "[a]ll she was sure of was that when she resigned, before the final dissolution of the Project, she was assured that nothing would be sold." *Id.*

A March 6, 1944 *Time* magazine article entitled *Art: Cut-Rate Culture* dated March 6, 1944, reported:

> The clammy catacombs of a U.S. Government warehouse in Flushing, N.Y. sheltered, last year, bales and bales of old painters' canvas. One day, following an elaborate sheaf of official orders, a truck backed up to the warehouse, carted off the canvases to Manhattan. There were several thousand earnest easel paintings which WPA had somehow deemed "unallocatable." Dr. Win-the-War's Government had decided to liquidate the last traces of Dr. New Deal's great WPA Art Project. The bales of paintings jiggling on the truck were sold for junk.
>
> . . . .
>
> Last week word went around Manhattan that some of the mildewed bundles of art had been rescued, could be seen in the back room of a dingy Canal Street bric-a-brac shop run by one Henry C. Roberts. Art dealers snapped up hundreds of pictures at $3 to $5 apiece. They planned to clean, mount, frame and resell them.

PX 8 at 1 (star note omitted).

Later accounts harken back to earlier articles and repeat the prior reporting.  An article by Elizabeth Stevens titled *The Thirties Revived:"Federal Art Patronage, 1933-1943*" from the Summer 1966 edition of *Artforum* discussing an exhibition of WPA artwork at the University of Maryland, stated in relevant part:

> The two Jackson Pollock canvases were auctioned off in 1944 with thousands of other "surplus" WPA works.  A plumber bought a number of paintings to use as cheap pipe insulation, but sold the lot to a junk dealer when he found that the oil paint smelled when heated.

PX 11 at 7.

In *The Roots & Routes of Art in the 20th Century*, published in 1975, Michele Cone similarly stated during her discussion of the New York Region of the Federal Art Project that:

> A New York restorer-dealer, Herbert Benevy, retrieved some two hundred canvases out of a lot of several thousand that had been auctioned off by the defunct Project in 1944 and bought by a plumber for insulation, when the plumber, finding them unsuitable, turned them over to a junk dealer.  Most of the pictures have since disappeared from the restorer's shop, apparently stolen.

PX 10 at 171.

In their 1989 book, *Jackson Pollock: An America Saga*, Steven Naifenh and Gregory White Smith stated in relevant part:

> In December 1942, . . . [t]he art projects had finally reached the end of the road. Within a few years, government warehouses would quietly begin auctioning off thousands of unallocated canvases *by the pound*, along with old copper and scrap iron. . . . When a cache of hundreds of Project paintings, including several by Jackson, turned up at a secondhand store in Manhattan two years later, the news created a sensation.  A plumber had bought the whole lot at government auction for four cents a pound, intending to use the canvas as pipe insulation.  He sold it only when he discovered that "pipe heat and oil paint produced an unattractive smell."  When they heard the news, artists, including Jackson, rushed to reclaim their works at three to file dollars apiece (twenty-five dollars for murals).

PX 14 at 433.

In his 2008 book *American-Made: The Enduring Legacy of the WPA: When FDR Put the Nation to Work*, Nick Taylor relayed similar information:

Much valuable work was lost, the canvases of the easel art division of the Federal Art Project being the first casualties. Thousands of them were still "unallocated" when Pearl Harbor brought the nation into World War II, meaning that they had not found homes on the walls of government offices as had been intended. In the haste of mobilizing in the emergency of all-out war, they were shipped to warehouses for storage. What happened then — or didn't happen — became the stuff of urban legend in the art world. At some point the paintings were deemed to be expendable. One account had them being auctioned off as scrap at 4 cents a pound. One auction lot of canvases was purchased by a New York plumbing contractor who intended to use them as pipe insulation, but the oil paint on hot pipes 'produced an unattractive smell' and the plumbing man sold them to a secondhand store in Manhattan, where artists including Jackson Pollock rushed to buy their works back for $3 to $5 apiece. A *Time* magazine item in 1944 recounted the journey of "bales" of easel paintings from a Flushing, Queens, warehouse to a bric-a-brac shop on Canal Street in Manhattan, where art dealers bought them on the cheap — again, $3 to $5 — to clean, mount, frame, and resell.

PX 15 at 528.

The Court affords these articles and reports very limited weight. While there are several accounts, many recycle the same reports. Setting aside some of the hearsay concerns, none of the authors of any of the documents claim to have personally witnessed a Government sale. The sources instead reference second-hand knowledge of a sale of canvases to a "plumber" who then turned them over to a "junk dealer," with the paintings eventually finding their way into a Lower East Side bric-a-brac shop. *See, e.g.*, PX 7; PX 8; PX 10; PX 15. At least one source characterizes these accounts as "the stuff of urban legend in the art world." PX 15. Foster points to the fact that Audrey McMahon, the Director of the New York Region of the FAP, lamented the "shameful history" of the liquidation of the FAP artworks in her essay, "A General View of the WPA Federal Art Project in New York City and State," in the 1972 book, *The New Deal Art Projects: An Anthology of Memoirs*. Specifically, McMahon states: "I had ordered the unallocated works placed in storage, and had been assured that there would be no destruction but that they would remain there pending ultimate distribution. What did happen is shameful history. I have long experienced a measure of guilt in that I failed to

remain on the scene." PX 13 at 75. However, McMahon, too, lacked personal knowledge of the events in question, given that she stated that "[b]y the end of January 1943 our program was liquidated and I resigned. The final disposal of Project works was not known to me when it occurred." *Id.*

Even if some sales occurred, the reports suggest that any surplus sales of FAP artwork were limited to materials that were either deemed "unallocated" or "unallocatable" at the program's conclusion. *See, e.g.*, PX 7 (referencing canvases "[l]eft over as 'unallocatable' from the WPA Art Project"); PX 8 (describing "several thousand earnest easel paintings which WPA had somehow deemed 'unallocatable'"); PX 13 at 75 (McMahon stating that she had "ordered the unallocated works placed in storage"); PX 14 at 433 (referencing auctions of "thousands of unallocated canvases *by the pound*, along with old copper and scrap iron"). These accounts do not support the notion that framed, completed, professional works of art were sold to private parties.

Those with personal knowledge at the time of the liquidation of the WPA refuted the reports of auction sales and placed them in a broader context, both in terms of the types of unallocatable works that were deemed surplus as well as the very small percentage of FAP works that were so designated. In an April 20, 1944 letter to *Life* magazine, Holger Cahill, the Director of the WPA's FAP and Art Programs, responded to an article published by *Life* earlier that month claiming that WPA canvases were "sold for junk," PX 9 at 2, stating that the work mentioned in the article "represents a fraction of one percent of WPA Art Project production." PX 18 at 2. In his letter, Cahill explained that the WPA Art Projects allocated work to sponsoring agencies — public tax-supported institutions — and not to private individuals. PX 18 at 2. Cahill noted that, upon the agency's termination, only unallocated work was turned over to the Procurement Division of the U.S. Treasury. *Id.* Once more

stressing the very limited number of items deemed surplus at the WPA's termination, Cahill stated that only a "fraction of one percent of the [FAP] work remained unallocated and was disposed of as surplus property." *Id.* at 3. According to Cahill, "[a] great many of the works remaining unallocated at the close of the New York City project" were "preliminary" sketches and details, "prepared for a special purpose, and not intended to be allocated." *Id.* With respect to unallocated easel paintings in particular, Cahill wrote that, at the WPA's conclusion, such works would have fallen into three categories: (1) "unfinished work"; (2) "work not accepted by project supervisors or project advisory committees"; and (3) "work returned by public institutions after the close of the New York City WPA Art Projects." *Id.* Some work was unfinished because mandatory regulations required that WPA employees take jobs in private enterprise when they were offered. *Id.* Congress also "passed the 18 month rule in 1939," which provided that WPA employees could only be employed for 18 months, resulting in "many artists . . . be[ing] summarily dropped and some of their work remain[ing] unfinished." *Id.* The second category of unallocatable work was "trial paintings made by art teachers, craftsmen, and workers in the allied arts who were given opportunities to qualify for the easel painting division, and whose work was not accepted by project committees." *Id.* Finally, works returned from exhibitions or by public institutions that no longer wished to keep them after the termination of the agency "would go to the Procurement Division of the U.S. Treasury for disposition, unless claimed by the sponsors." *Id.* Stressing the value of the program, Cahill enclosed a list of "[s]ome of the more than 14,000 public institutions which received works of art and services from the WPA Art Project." *Id.* at 5.

A group of WPA artists supported this account of the limited number of unallocated works that were transferred to the Procurement Division in an April 30, 1944 letter to the *New York Times* regarding the alleged sale of WPA property:

> [T]he work recently sold at auction as surplus property is but a small fraction of 1 per cent of the WPA Art Project's production in creative art. A few easel paintings and murals, including sketches and unfinished works, were on hand when the project came to an end in the spring of 1943. These, following long-established Government routine, were turned over to the Procurement Division.

PX 44.

Foster relies heavily on a single government archival record that vaguely references a potential sale of WPA artwork: a February 28, 1944 memorandum from the New York Regional Director of the Procurement Division, Fred S. Albrecht, to the Director of Procurement, Clifton Mack, *see generally* PX 40. Albrecht's memorandum enclosed a newspaper clipping from the *New York World-Telegram*, titled "Artists Irked by Sale of Canvases for Junk," and set forth the results of his investigation into the matters reported therein. He explained that he identified two WPA property declarations reflecting potential sales to the public. *Id.* at 1. Neither declaration has been located, despite diligent efforts by the Government. *See* Tr. at 152:11-15, 153:16-154:11; 192:14-16. According to Albrecht's memorandum, one declaration, dated November 19, 1943, described the sale of "approximately 2,000 pounds scrap oil paintings on canvas" that were brought to a WPA warehouse, "placed on bid" to various scrap dealers, and ultimately sold to Canal Brass & Supply Company. *Id.* The memorandum indicated that Charles Kraft, the Senior Clerk who signed the underlying inspection and appraisal report, stated that the "canvas was treated as scrap by the [WPA] prior to its receipt at the warehouse, that is, it was folded and thrown together in haphazard fashion," and, based on a representative sample that Mr. Kraft reviewed, "cracked and wrinkled from the handling it received." *Id.*; *see id.* at 2 ("From the foregoing, it can be ascertained that the material was treated entirely as scrap canvas and not as works of art."). The memorandum then described a second, undated declaration, in a single, cursory sentence. Albrecht stated that the second declaration reflected a sale "where

pictures were declared by the [WPA] as oil paintings, the bidders list included representative art dealers and art galleries and sale was made on the basis of works of art." *Id.* at 2. No further details are provided with respect to this sale of "pictures" declared by the WPA as "oil paintings."

The memorandum's summary of the first declaration's reference to "scrap oil paintings" that are "not . . . works of art" clearly does not describe completed, professional FAP artworks. Thus, this portion of the memorandum does not support a finding that completed, professionally commissioned FAP artwork was sold to private individuals. Rather, the memorandum's description of a sale of "scrap oil paintings" is consistent with Cahill's recounting of the unfinished and unallocatable canvasses and other surplus art materials that were turned over to the Procurement Division and ultimately sold.

The memorandum's summary of a second declaration referencing "pictures . . . declared by the WPA as oil paintings" is more intriguing, but the memorandum does not provide enough information for the Court to conclusively find that there was a sale of completed, professional FAP oil paintings. First, as Erickson credibly testified, it is not clear whether the paintings referenced in the declaration are even completed FAP artworks, as opposed to artworks created through teaching projects or other service activities commissioned by the WPA. *See, e.g.*, Tr. at 192:17-193:1 (explaining that, toward the end of the WPA, the Art Project "had teachers' classes, they had children's classes, there was a lot of art demonstrations"); Tr. at 197:10-13 (Erickson: "[M]ore than half the artists employed in WPA projects were engaged in teaching and service activities."). In his April 1944 letter to *Life* Magazine, Cahill likewise observed that unallocated material at the conclusion of the program included "trial paintings made by art teachers, craftsmen, and workers in the allied arts who were given opportunities to qualify for the easel painting division, and whose work

43

was not accepted by project committees." PX 18 at 3. Moreover, as Erickson testified, Albrecht was not someone from the FAP project familiar with the nuances of the art program, but an agent of the Procurement Division. Tr. at 192:24-193:1; *id.* at 193:19-194:1 (Erickson testifying that she could not determine the meaning of the sentence in Albrecht's memorandum regarding the second declaration because "the administrators on the art program would have been looking at this differently than, say, a procurement property division person"). In sum, the Court finds that the reference to sales of oil paintings in PX 40 is too vague to draw any conclusions about whether completed, professionally commissioned FAP paintings were sold to the public.

Finally, Foster points to an exchange between a private citizen, Gilbert Ask, and a government official in May 1944, in which Ask represented that he "acquired a few paintings which were done under the Federal Arts Project." PX 16. Specifically, Ask stated:

> A short time ago I acquired a few paintings which were done under the Federal Arts Project. The canvases are unsigned, but each bears two numbers on the flap — one in large red numerals and the other in ink or blue pencil. I am told that it might be possible from your records to ascertain the name of the artist and the title of the picture.

*Id.* Foster argues that this letter supports a finding that FAP paintings were sold to private individuals at or around the time of the WPA's liquidation. The letter, however, is not substantiated by any corroborating evidence indicating that the paintings Ask referenced were in fact FAP artworks. A government official responded and informed Ask that the WPA had since been liquidated, and directed him to the New York City Mayor, who might have preserved production records. PX 17. No further information regarding this letter was presented at trial. Instead, Foster focused on the fact that Ask represented that the canvases he acquired included numerical digits in red or blue ink. At trial, Foster argued that it was significant that five of the six numbers that Ask listed as being in blue on the canvases he

acquired were four-digit numbers, and that *Lights Across the Lake* also has a four-digit number in blue ink on its frame.  Tr. at 10:24-11:2.  For several reasons, the Court does not find that the numbers (or letter itself) support the inference that completed, professional paintings were sold through surplus sales.  First, the Court personally observed the four-digit number on the frame of *Lights Across the Lake* and it is unclear whether it is written in blue or black ink.  Second, there is no basis for inferring that the numbers in the Ask letter are associated with surplus sales of FAP artwork.  To the contrary, two of the other FAP artworks introduced at trial — Ledbuska's *Wild Horses in a Dale* and Lubovsky's *Sleep* — bore similar four-digit numbers on their canvases, despite having been clearly loaned or allocated to institutions and not designated as surplus.  Third, Erickson credibly testified that, based on her over twenty-five years working as a Fine Arts Management Specialist in the GSA cataloguing and identifying New Deal–era artworks, the numbers in Ask's letter and on the back of the Painting did not have any significance.  Tr. at 202:19-203:7.  The Court credits Erickson's testimony that, in her experience, it is not uncommon that paintings have numbers on them, including for regional cataloguing, and that there is no indication that the numbers referenced in Ask's letter have anything to do with designating the canvases as surplus for public sale.  *Id.*  Finally, Ask provided no details as to how he "acquired" these paintings — in other words, they could just as likely have been acquired through unauthorized means, such as receiving them from an institution that was not permitted to transfer title, rather than through any authorized surplus sale.

In sum, the documents relied upon by Foster suggest — at most — that there may have been an auction sale out of the Corona, New York warehouse of unallocatable or unallocated, primarily unfinished, surplus FAP canvases or artwork.  On the present record before the Court, given the countervailing evidence, including the purpose of the WPA's FAP program,

the Court finds that these accounts lack sufficient particularity or indicia of reliability to support a finding, by a preponderance of the evidence, that the Government undertook authorized sales of completed, professionally commissioned, allocatable FAP easel paintings to members of the public.[6]

## B. The Sale of *Lights Across the Lake*

However, even if surplus sales to the public following the WPA's termination included a small fraction of completed, professionally commissioned, allocatable FAP easel paintings, Foster still fails to meet his burden of proving that the Government sold *Lights Across the Lake* — or otherwise relinquished its title to the Painting — through an explicit and authorized act.

### i.    Foster's Motion for an Adverse Inference

As an initial matter, Foster asked the Court in his pretrial motion *in limine* to draw an adverse inference in his favor based on the Government's alleged negligence in failing to preserve documents related to the WPA liquidation, including inventory records and records showing the disposition of the Painting.  *See* Dkt. 91.  Specifically, Foster asked the Court to assume that the Painting was sold in a surplus auction.  *Id.* at 1.  The Court rejected Foster's

---

[6] *Hoelzer v. City of Stamford*, 933 F.2d 1131 (2d Cir. 1992), cited by Foster, does not alter the Court's findings.  In *Hoelzer*, a professional art restorer, who had been in possession of federally commissioned murals under the Public Works of Art Project for many years, brought an action to quiet title to the murals after the City of Stamford sought to repossess them.  *Id.* at 1133-35.  *Hoelzer* did not address whether, or under what circumstances, title to federally commissioned artwork could be or was legally conveyed to private citizens.  Rather, the question before the Second Circuit was whether the statute of limitations for Stamford's repossession claim had run, and if not, whether Stamford had nevertheless abandoned its rights to the murals.  *Id.* at 1135-39.  *Hoelzer* therefore examined state law principles governing private property disputes, which are not applicable here.  *See California*, 332 U.S. at 40.  The Court declines to infer from *Hoelzer* any broader principles pertaining to federal property ownership, especially given the different context here of portable artworks created under a separate federal program.

pretrial motion.  Dkt. 110 at 15:5-19:4.  Having now heard and further reviewed all of the evidence in this case, including testimony and evidence pertaining to the Government's records, the Court continues to decline to draw an adverse inference against the Government.

Adverse inferences may be drawn as a sanction for spoliation.  The party seeking spoliation sanctions has the burden of establishing the elements of his claim for sanctions. *Khaldei v. Kaspiev*, 961 F. Supp. 2d 564, 569 (2013), *aff'd*, 961 F. Supp. 2d 572 (S.D.N.Y. 2013).  Those elements are (1) "that the party having control over the evidence had an obligation to preserve it at the time that it was destroyed"; (2) that the evidence was "destroyed with a culpable state of mind"; and (3) "that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Residential Funding Corp. v. De George Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001)).  Therefore, "[i]n order to receive an adverse inference instruction," the movant "must demonstrate not only that [the non-movant] destroyed relevant evidence as that term is ordinarily understood, but also that the destroyed evidence would have been favorable to her." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) (footnote omitted) (first citing Fed R. Evid. 401; then citing Fed. R. Civ. P. 26(b)(1); and then citing *Residential Funding*, 306 F.3d at 108-09).  "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would have been harmful to him."  *Id.* (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991)).  The Court has discretion as to whether to grant a sanction, *Residential Funding*, 306 F.3d at 107, and an adverse inference is an "extreme sanction and should not be given lightly," *Rhoda v. Rhoda*,

No. 14-cv-06740 (CM), 2017 WL 4712419, at *1 (S.D.N.Y. Oct. 3, 2017) (quoting *Zubulake*, 220 F.R.D at 220).

As the Court stated in its pretrial ruling, Foster has not met his burden of showing that the Government destroyed any provenance documentation for *Lights Across the Lake*, and nothing presented at trial has demonstrated otherwise.  Any loan or allocation documents for the Painting would be nearly a century old.  Moreover, the WPA records held at the National Archives are voluminous — there are over 17 million documents stored at the National Archives, consisting of more than 11.9 billion total pages of records.[7]  While some examples of loan and allocation receipts were introduced at trial, *see, e.g.*, DX 23,  Erickson testified that, in her experience, it is "not uncommon" for the GSA not to be able to locate the underlying loan and allocation receipts for FAP paintings.  *See* Tr. at 121:21-122:2, 132:16-19.  In fact, the GSA did not locate loan or allocation receipts for any of the other FAP paintings exhibited at trial, despite searching for those receipts.  Tr. at 116:20-25, 119:24-120:4, 121:15-20.  Yet it is clear that those paintings were loaned to institutions consistent with FAP procedures and have remained at those institutions for years — Ledbuska's *Wild Horses in a Dale* and Lubovsky's *Sleep* remain on loan to public institutions to this day.  *See* DX 8-10; *see also* Tr. at 116:4-25, 119:12-120:4, 121:4-20.  Therefore, just because the Government has not found loan or allocation documents for *Lights Across the Lake* — which is just one of more than 100,000 paintings created under the WPA — after diligent searching does not mean that any such documents were destroyed.  In any event, the existence of loan or allocation documentation for *Lights Across the Lake* would assist the Government's case, not Foster's.  Any sanction imposed  should be designed to "restore 'the prejudiced party to the

---

[7] *See Record Group Explorer*, Nat'l Archives, https://www.archives.gov/findingaid/record-group-explorer [https://perma.cc/D52G-HC7Z].

same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)); *see also Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (destroyed evidence must have been of such nature that "a reasonable trier of fact could find that it would support [the movant's] claim or defense" (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012))); *Twitty v. Salius*, 455 F. App'x 97, 99 (2d Cir. 2012) (summary order) (holding that district court did not abuse its discretion in refusing an adverse inference where the destruction of a tape "did not materially prejudice the plaintiff's case"). Here, where existence of loan or allocation documentation would not favor Foster, Foster suffers no prejudice. An adverse inference against the Government is therefore unwarranted.

As for sale documents, there is no evidence that any sale documents for this Painting (or any FAP painting) were destroyed, or even existed. The Government undertook a diligent search for those records, dedicating over 250 hours to scouring the National Archives, and yet did not unearth any bill of sale, title transfer documentation, or receipt memorializing any sale of any WPA artwork, nor any document listing FAP artwork as surplus property. Tr. at 144:12-15, 151:25-152:15. Moreover, for the reasons set forth below, the Court finds highly unlikely that *Lights Across the Lake* in particular was at any point sold to a private citizen. The more plausible inference from the absence of sale documents is thus that such documents never existed, not that they were destroyed, let alone with a culpable mind. *See, e.g.*, *Hoffer v. Tellone*, 128 F.4th 433, 441 (2d Cir. 2025) (affirming denial of adverse inference where there was insufficient evidence that the allegedly spoliated video even existed); *Johnson v. Perry*, 763 F. App'x 81, 84 (2d Cir. 2019) (summary order) (upholding district court's denial of an adverse inference given the "lack of evidence suggesting that any evidence was destroyed"

and where an investigator testified that "no footage" captured any aspect of the relevant altercation); *Tri-Country Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007) (declining to impose spoliation sanctions where plaintiff "ha[d] not proffered a scintilla of evidence that the alleged missing [evidence] ever existed in the first place," but "simply speculate[d] that [the evidence] *may have* existed."), *aff'd*, 301 F. App'x 11 (2d Cir. 2008) (summary order).  "[S]peculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence."  *Id.*; *see also Alaimo v. Trans World Airlines, Inc.*, No. 00-cv-03906 (GBD), 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) ("Since plaintiff has not establish[ed] that the records and documents she sought ever existed, there can be no finding of spoliation of evidence."); *Nin v. Liao*, No. 02-cv-08308 (JCF), 2004 WL 2848520, at *6 (S.D.N.Y. Dec. 9, 2004) ("Since [defendant] cannot establish that the claimed [evidence] existed, it is impossible to say that spoliation occurred."); *Riddle v. Liz Clairborne, Inc.*, No. 00-cv-01374 (MBM) (HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003) (similar).

However, even if Foster could show that documents relating to the sale of FAP artworks were destroyed or negligently maintained, an adverse inference would still not be warranted here.  Foster has not shown that the Government had any obligation to preserve documentation related to *Lights Across the Lake* at the time of its alleged destruction over eighty years ago.  There is no evidence, for instance, that the Government could have anticipated this (or any) litigation related to *Lights Across the Lake* at that time  *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) ("Th[e] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation — most commonly when suit has already been filed," but "also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to a future

litigation.").  And while it is true that destroying evidence in violation of a regulation that

requires its retention can also give rise to an inference of spoliation, *see Byrnie,* 243 F.3d at

108-09, the record does not reflect that any rule or regulation was violated here.  Foster points

to the Federal Records Act of 1950, but the Federal Records Act does not establish a basis for

an adverse inference here.  First, the Act postdates any alleged destruction of documents

related to the Painting prior to 1950, including any destruction of documents associated with

the WPA's liquidation.  Foster argues that *Lights Across the Lake* was sold from a warehouse

in Corona, New York, at the time of the WPA's liquidation in 1944 — prior to the enactment

of the Federal Records Act.  Second, the Federal Records Act does not require the

preservation of every single record.  Rather, the Act merely authorizes federal agencies to

develop a "'records management program' and to define which documents are 'appropriate

for preservation' as agency records."  *Kissinger v. Reps. Comm. for Freedom of the Press*, 445

U.S. 136, 147 (1980) (quoting 44 U.S.C. § 2901, and then quoting 44 U.S.C. §

3301(a)(1)(A)).

     While Foster suggests that there were "myriad recordkeeping requirements obligating

the WPA and the Procurement Division to keep inventory records," Dkt. 91 at 8, none of

theprotocols or procedures cited by Foster supply a basis for imposing an adverse inference.

The protocols and procedures Foster relies upon required only that the WPA and the

Procurement Division *create* certain records.  They said nothing of either agencies'

preservation obligations.  *See, e.g.*, PX 21 (requiring that a "stock record . . . be kept by each

region of surplus property by individual item"); DX 18 at 3 (observing Allocation Center's

obligation to "lis[t] and recor[d] . . . the material selected"); PX 29 at 3 (requiring

Procurement Division official to execute receipts for all property transferred to the

Procurement Division); PX 23 (requiring WPA officials to prepare "Forms 812" to document

their inventory).  In sum, no basis has been presented to the Court to support a finding that the Government disobeyed any recordkeeping law or rule with respect to records for the Painting.

Taking Foster's argument to its logical conclusion would mean that a spoliation sanction of an adverse inference would be imposed on the Government any time the Government was simply unable to locate federal records from decades ago.  Such a severe sanction runs counter to the direction that the law has taken with respect to spoliation sanctions.  For example, Federal Rule of Civil Procedure 37(e) speaks to electronically stored information ("ESI"), but has reined in spoliation sanctions by providing that the culpable state of mind cannot entail ordinary or gross negligence; rather, the plaintiff must show an intent to deprive another party of the ESI's use in the litigation.  *See, e.g., Hoffer*, 128 F.4th at 437-38. Adopting Foster's proposed adverse inference under these circumstances would also be contrary to well-established precedent governing federal property ownership.  Imposing an adverse inference against the Government would effectively result in a finding that, due to allegedly negligent recordkeeping practices that occurred nearly a century ago, the Government has relinquished its property rights.  That would be directly at odds with the principle that the United States government cannot extinguish its property interests through negligence, laches, acquiescence, or a failure to act.  *See, e.g*., *California*, 332 U.S. at 39-40.

For all of these reasons, the Court declines to exercise its discretion to impose an adverse inference on the Government.  *See, e.g.*, *Fujitsu Ltd. v. Fed. Exp. Corp*., 247 F.3d 423, 436 (2d Cir. 2001) ("The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.") (citation omitted); *see also Goodyear Tire & Rubber Co*., 167 F.3d at 779 (acknowledging district court's "broad discretion" in determining proper sanction for spoliation).

### ii.    Foster's Theory of an Authorized Sale of *Lights Across the Lake*

The Court will next move on to evaluating the evidence presented with respect to whether there was an authorized sale of *Lights Across the Lake*.  Foster's theory is that in wake of the WPA's liquidation, Procurement Division officials, acting pursuant to congressionally delegated authority, sold the Painting in a surplus sale out of a warehouse in Corona, New York.  But even if it were the case that some trivial fraction of completed, commissioned FAP paintings were sold as surplus after the WPA was liquidated (which, for the reasons set forth above, the Court finds highly unlikely), Foster has not proven that *Lights Across the Lake* was a part of any such sale.

None of the documentation that Foster introduced at trial referencing an auction sale of surplus FAP works makes any reference to either Maxim Lubovsky or *Lights Across the Lake*.  *See, e.g.*, PX 7 to 15; PX 18 to 19; PX 44.  In its own independent research in the National Archives, the Government did not uncover any bill of sale, title transfer documentation, or receipt memorializing any sale of WPA artwork, let alone of *Lights Across the Lake*.  Tr. at 144:12-15, 151:25-152:15.  Most importantly, though, Erickson credibly testified, and the Court finds, that *Lights Across the Lake* was loaned or allocated, Tr. at 177:10-14, and therefore almost certainly would not have been included in any surplus auction in 1943.

Consistent with FAP loan and allocation procedures, *Lights Across the Lake* has all of the indicia of a loaned or allocated painting.  First, the reverse side of the painting has the remnants of what appears to be a FAP #3 identification card in the top left-hand corner of its frame, as is typical of paintings that were loaned or allocated.  The Court personally observed that remnants of the label on the left-hand corner of the frame show part of the letter "A," the letter "P," and part of a hashmark, consistent with the FAP #3 Form that is used for loaning or allocating FAP artwork, *see* DX 1 at 5, and mirroring the FAP #3 Form affixed to other

loaned or allocated FAP paintings, *see* DX 8A at 9; DX 9A at 10-11; DX 10A at 6; *see also* Tr. at 136:20-138:23, 139:1-14.  There is also a "faint outline" of where the FAP #3 label would have been based on the oxidation of the wood frame, again resembling the dimensions of FAP identification labels on other FAP paintings.  *Compare* DX 1A at 13-14, *with* DX 8A at 7-9, DX 9A at 9-11, *and* DX 10A at 4, 6.  *See also* Tr. at 137:6-13, 139:1-140:3.  The aging of the fragment's paper is likewise consistent with how identification cards erode over time. *See, e.g.*, Tr. at 139:5-7 (Erickson: "[I]t's not uncommon that the tags would be in this sort of condition because they were not archivally produced."); *id.* at 139:21-23 (Erickson: "[I]t becomes friable, brittle, as it ages, so it's not uncommon for us to see a tag in this sort of condition.").  The Court observed this erosion when it viewed the deteriorating FAP #3 card that was attached to Maxim Lubovsky's *Sleep*.  Tr. at 142:16-25.  Finally, Erickson credibly testified that it is "common" for the FAP #3 identification card to be ripped or torn off.  Tr. at 141:7-11.

At trial, Plaintiff's counsel disputed that the remnants of a label on the reverse side of the Painting were from an FAP identification card, arguing that the "tiny scrap of paper attached to the back of the frame" was "doing a lot of work in the Government's theory."  Tr. at 11:23-12:2.  Erickson, however, credibly testified that she was "certain" that the remnants were from an FAP identification card, Tr. at 177:12-14, and the Court agrees based on all of the aforementioned indicia.  Moreover, although the number after the hashmark is not present on the remnant, the FAP #2 Form is about the size of a half of a piece of paper — larger than the FAP #3 Form, which is about the size of an index card.  Tr. at 170:20-171:21.  Thus, the "faint outline" of the label on *Lights Across the Lake*'s frame is more consistent with the size and dimensions of the FAP #3 form than the larger FAP #2 Form.

Foster next argued that FAP procedures and policies technically required that identification cards be glued and tacked to the stretcher of oil paintings, not directly on the frame where the scrap of paper is located on the Painting.  Tr. at 175:11-20.  This does not persuade the Court that the Painting was not loaned or allocated.  Erickson credibly testified that "it's not uncommon that [government officials] would have tacked [the identification card] to the frame," and that she has seen identification cards affixed to both frames and stretcher bars for loaned and allocated paintings.  Tr. at 176:13-15.

Second, the Painting has brass tacks in the place on the frame where WPA administrators would secure the FAP #3 card.  *See, e.g.*, DX 1A at 13-14, 17.  The brass tacks on the FAP #3 fragment are the same as the tacks used to secure the FAP #3 identification card on other loaned or allocated paintings and appear in the same configuration as the tacks on Lebduska's *Wild Horses in a Dale* presented at trial.  *See* Tr. at 137:14-23 (Erickson testifying that the tacks used across the FAP paintings are the same and are typical for the 1930s or 1940s); DX 8A at 7-9.

Third, the Painting's frame has two holes at the lower center of the frame where the "FAP" brass tag would have been affixed.  *See* DX 1A at 4; Tr. at 133:8-13.  Those holes match the location and dimensions of the WPA brass tag as detailed in the loan and allocation policies and procedures, and are similar to the placement of the tags on the three other loaned and allocated WPA paintings that were displayed at trial.  Tr. 133:3-13, 134:3-15; *see also* DX 8A at 3-4; DX 9A at 5-6; DX 10A at 11.  That the actual tag is missing is not consequential; Erickson testified that it is common for the brass tag to separate from loaned or allocated FAP artwork over time.  Tr. at 134:10-15.

Fourth, there are multiple FAP stamps on the reverse of the canvas.  DX 1A at 10, 12, 18; Tr. at 133:10-13, 136:20-25.

Finally, the frame of *Lights Across the Lake* shares various characteristics with frames of other loaned or allocated FAP paintings from GSA's Fine Arts collection.  Tr. at 133:3-13, 133:19-134:2, 134:23-136:19.  Indeed, the frame on the Painting is identical to the frame on Carpenter's *Fruits and Vegetables*, which Erickson testified at trial was a loaned work.  *Compare* DX 1A at 1-3, *with* DX 9A at 1-3, *and* JX 3; *see also* Tr. at 119:3-23.  The frame on *Lights Across the Lake* is typical of those frames manufactured by WPA framers in workshops.  Tr. at 135:2-5.  As Erickson testified, that a painting was framed is further evidence that it was loaned or allocated: paintings were framed so "that they were ready to be displayed for the public."  Tr. at 136:4-10.  Moreover, Erickson testified that she was not aware of any instances "[o]ther than exhibits and loans and allocations" when FAP works would be framed.  *See* Tr. at 210:13-17.

In sum, as covered in great detail by Erickson at trial and personally observed by the Court, *Lights Across the Lake* bears all the physical indicia of a loaned or allocated painting.  That is, the Painting has the remnants of an FAP #3 identification card; brass tacks; holes consistent with the brass tag affixed to loaned or allocated works; a frame consistent with those used for FAP paintings; a signature in the lower right-hand corner of the canvas; and a FAP stamp on the reverse side of the Painting.  Tr. at 133:3-13, 133:19-142:4; DX 8-10.  Because the Painting was photographed by the FAP's Photographic Division in 1939, it was necessarily loaned or allocated at some point thereafter.  Tr. at 128:4-129:5, 174:8-13; *see also* JX 2; DX 5.  The Court therefore finds that the evidence shows that, at some point during or after 1939, the painting was allocated or loaned pursuant to FAP policies and procedures.

Foster's reliance on the absence of any record of a loan or allocation of the Painting is not persuasive.  For substantially the same reasons that the Court declines to adopt an adverse inference based on the absence of such documentation, the Court declines to accord the

absence of these documents much evidentiary weight. With over 1.7 million records in the National Archives, the Government's inability to identify underlying loan or allocation documents is not by itself sufficient to give rise to an inference that a particular work was not loaned or allocated. As stated previously, while there are some loan records, it is not uncommon for the Government to be unable to find loan documentation for FAP works. In fact, the Government was unable to locate such documentation for the three other paintings that were displayed at trial, all of which were indisputably loaned or allocated. Tr. at 116:20-25, 119:24-120:4, 121:15-20. Certainly where, as here, contrary evidence — including physical markings and identifiers on the Painting itself — persuasively establishes that a given work was in fact loaned or allocated to a public or nonprofit institution, the absence of underlying documentation is far from dispositive.

The fact that the Painting was loaned or allocated proves fatal to Foster's case. The parties concede that neither loan nor allocation of WPA artworks transfers ownership away from the federal government. SOL, ¶ 11; Tr. at 249:6-15. The only meaningful distinction between a loan and an allocation is the intended recipient of the property: loans are made to nonprofit institutions, while allocations are made to public tax-supported institutions. Tr. at 107:14-24. The legal effect of both is otherwise the same: neither a "loan" nor an "allocation" amounts to a full-fledged divestment of the Government's property interest. Rather, whether loaned or allocated, title for a work of art is only conditionally transferred, with the expectation that it will revert back to the Government when the recipient entity wishes to be released from the responsibility of custody. *See, e.g.*, DX 1 at 5 ("This work is the property of the United States Government and is loaned subject to regulations of allocation and is not to be removed."); DX 2 at 5 ("If an institution which has received a work of art on loan desires to be released from the responsibility of custody of the work, the official representative of the

institution shall communicate directly with the Director of the Federal Art Project, Washington, D.C."); DX 4 ("The policy of allocating works of art to public institutions on a loan basis rather than as an outright allocation enables the Federal Government to recover works from these institutions which no longer have need of them and to reallocate such works to other institutions which may request them.").

Having determined that *Lights Across the Lake* was allocated or loaned at some point during or after 1939, Foster's theory that the Painting was sold in a surplus auction sale becomes increasingly implausible. In his April 20, 1944 letter to *Life* Magazine, Cahill recognized the possibility of public institutions returning artworks to the Government after the close of the New York City WPA Art projects. PX 18 at 3. The Court therefore acknowledges that it is theoretically possible that the *Lights Across the Lake* was returned to the Government during the short window of 1939 to 1942. But that scenario is highly unlikely: indeed, Cahill himself stated that returned works of art, along with unfinished works and works not accepted by project sponsors, still constituted but a "fraction of one percent of WPA Art Project production." *Id.* For Foster to prevail, the Court would need to find that, at some point between 1939 and the WPA's termination in December 1942, the recipient institution returned the previously loaned or allocated Painting to the Government, that the Painting was subsequently designated "surplus" property, and that it was then sold to the public by Procurement Division officials.

There is no indication that the Painting was returned to the Government during the short window between 1939 and the agency's termination in 1942. To the contrary, consistent with the WPA's commitment to placing FAP artwork on display for the American public's enjoyment, the evidence introduced at trial suggests that FAP artwork generally remained with the recipient institution for long periods of time. *See, e.g.*, Tr. at 119:3-15 (Carpenter's

*Fruit and Vegetables* remained with its host institution until the 1990s, when it was returned to the GSA); *id.* at 121:4-20 (Lubovsky's *Sleep* has been on loan with the Morris Tuberculosis Hospital, and then with that institution's successor, until the present day); *id.* at 116:4-19 (same with respect to Ledbuska's *Wild Horses in a Dale*). Indeed, because FAP paintings were often loaned or allocated on a long-term basis, the Government has lost track of paintings over the years, resulting in its present-day efforts to locate and retrieve that body of work. DX 7 at 2:03-2:25.

Even if the Painting were returned to the Government before December 1942, there is no basis to find that the Painting — which was completed by a hired FAP artist, framed, and loaned or allocated — would have been designated as surplus. *Lights Across the Lake* was certainly not an unfinished or scrap canvas, like other WPA artworks that may have been designated surplus property. Indeed, the documents relied on by Foster suggest that surplus sales involved only "unallocated" or "unallocatable" artworks, *see, e.g.*, PX 7 to 8, 13 to14, 18; scrap oil paintings, PX 40; and unframed canvases, *see* PX 9-10, 12, 15. And only a "fraction of one percent" of total WPA artworks remained unallocated at the WPA's conclusion. PX 18 at 2; *see also* JX 27 at 2 ("It is obvious that the materials and equipment which remain in storage at the WPA yards . . . represent but a small fraction of the total amount of property which remained for liquidation after eight years of WPA operations in New York City."). Moreover, as discussed *supra*, even with regards to those works that remained unallocated at the time of the WPA's liquidation, government officials undertook significant efforts to continue to place those paintings in public institutions. *See, e.g.*, DX 12-16. In sum, the Court finds purely speculative — and certainly not "more likely than not" — Foster's urged theory that the Painting was loaned or allocated, returned to the Government

within a mere three-year span, designated as surplus, and then sold to the public alongside folded-up canvases and scrap materials.

Foster relies heavily on the fact that Maxim Lubovsky was employed in New York City and that there was potentially an auction sale of some subset of WPA artworks in a New York warehouse, to prove that *Lights Across the Lake* was sold in an authorized surplus auction. Tr. at 10:13-11:17. But again, Foster is asking the Court to make numerous inferences based on speculation and conjecture. Just because Lubovsky was employed in New York City does not necessarily prove that the allocated or loaned Painting was returned to a New York warehouse rather than another warehouse like the central Chicago Allocation Center, especially since FAP artwork was loaned nationally and Foster ultimately purchased the Painting from an auction in Iowa. That aside, at the time of the WPA's termination in 1943, there was only a "comparatively small number of oil paintings" left to be allocated in New York City: just 324 oil paintings, far less than the number of New York City institutions eligible for a loan or allocation. *See* JX 5. Indeed, the State Supervisor for the New York City WPA War Services Art Unit advised that it was "essential to definitely limit the number of items to be allocated to any one agency" with restricted exceptions to avoid any charges of favoritism toward one institution or another. *Id.* This suggestion of a limited supply of paintings necessitating almost a rationing approach for allocation, coupled with the concerted efforts to loan or allocate remaining artwork before liquidating the WPA, makes it even more unlikely that the Painting was sold as surplus. *See, e.g.*, DX 13 to 16.

Finally, contrary to Foster's arguments, it is irrelevant that the Government did not exercise its rights to repossess *Lights Across the Lake* when Foster first contacted the GSA about the Painting in 2013. The GSA requested further information from Foster regarding the Painting in 2013 and Foster did not provide it. PX 4 at 1; Tr. at 83:1-84:6. In any event,

"[i]nactivity, or neglect, upon the part of Government officers is insufficient to cause the Government to lose its property." *Kern Copters*, 277 F.2d at 313 (quoting *U.S. ex rel. Tenn. Valley Auth. v. Caylor*, 159 F. Supp. 410 (E.D. Tenn. 1958)). There is therefore no waiver of the Government's interest in the Painting by virtue of the Government's failure to exercise its rights sooner.

No one knows with certainty what happened to *Lights Across the Lake* in the intervening years between its creation in 1938 and Foster's purchase of the Painting from Jackson's Auction House in 2013. Theft or loss of WPA paintings over the last century is not an infrequent occurrence. *See, e.g.*, Tr. at 41:25-42:7. For instance, FAP paintings have entered the stream of private commerce after their removal from high school walls during renovations, *see* DX 44; DX 58; DX 61, and after being improperly gifted to ambassadors, Tr. at 272:17-24; DX 7; DX 59. FAP paintings have also been stolen from art galleries where they were on exhibition, DX 22, lost during office moves, DX 21 at 1, and retrieved from the trash, DX 46 at 2. Indeed, the frequency with which WPA artworks are lost, stolen, or otherwise disposed of through unauthorized and unlawful means prompted the GSA-OIG to undertake efforts to catalogue, identify, and recover FAP artworks. *See generally* DX 7.

What is clear, however, is that Foster has not presented sufficient evidence that the Government, through explicit and authorized acts, extinguished its title in the Painting. FAP paintings and other artworks commissioned under the New Deal–era relief programs are cultural artifacts with significant historical value. For the Government to lose title to these works under circumstances like those here, based on little more than conjecture and speculation, would run afoul of well-established precedent governing the disposition of federal property. That precedent makes clear that there must be affirmative evidence of an explicit and authorized relinquishment of the Government's rights. *Cf. Steinmetz*, 973 F.2d at

61

223 (finding that the Government retained interest in a sunken vessel seventy years later);

*Int'l Aircraft Recovery, LLC*, 218 F.3d at 1256-57 (finding that Government retained

ownership rights to plane that crashed in international waters decades prior); *Kern Copters*,

277 F.2d at 313 (finding that Army's failure to seek to recover helicopter remains from

Guatemalan jungle did not constitute abandonment).  Therefore, whatever path *Lights Across*

*the Lake* may have taken over the last century, the Court finds that, based on the record

presented here, Foster has not proven that the Government relinquished its ownership rights in

the Painting such that title was lawfully conveyed to him.

## CONCLUSION

For the reasons set forth herein, the Court concludes that Foster has not proven, by a

preponderance of the evidence, that he, rather than the Government, is the owner of *Lights*

*Across the Lake*.  The Court therefore directs that judgment be granted in favor of the

Government on Plaintiff's Fifth Amendment Due Process and Takings Clause claims.  Upon

the entry of judgment, the Clerk of Court is respectfully directed to close this case.

Dated: March 21, 2025
       New York, New York

SO ORDERED.

JENNIFER L. ROCHON
United States District Judge